579 So.2d 543 (1991)
Joy Pickle CALDWELL
v.
Carl R. CALDWELL.
No. 90-CA-0043.
Supreme Court of Mississippi.
April 17, 1991.
*544 Jeffrey C. Smith, Sims & Sims, Columbus, for appellant.
Donna S. Smith, Columbus, for appellee.
Before HAWKINS, P.J., and SULLIVAN and PITTMAN, JJ.
PITTMAN, Justice, for the Court:
This appeal finds its origin in a suit and countersuit for divorce between Joy and Carl Caldwell. Finding no grounds for divorce, the chancellor left the Caldwells married but separated, and made certain provisions for the support of the couple's two children. The litigation continued, based on accusations of contempt and frivolous appeals. We affirm in part, and reverse *545 in part in an effort to see that the decrees of the chancery court are obeyed.

I.
Joy and Carl Caldwell were married in 1964. Two children were born of the marriage: Mark, 20 years of age at the time of the hearing in the case at bar, and Matt, 15. Joy sued Carl for divorce in May 1986 in Lowndes County Chancery Court. That suit was eventually dismissed, but Joy again filed for divorce in August of 1987. Carl, separated from his wife, countersued. The chancery court granted a divorce to neither, but, in its judgment ("final decree") of July 25, 1988, ordered Carl to make the following payments: (1) $250.00 per month support for Matt Caldwell, though no specific time of the month was mandated for payment; (2) Mark's college expenses, including tuition, room, board and supplies; (3) Mark's car insurance; (3) $254.31 for the monthly mortgage payment on the family's home; (4) one-half of all medical expenses for the minor children not covered by Joy Caldwell's medical insurance.
On May 4, 1989, Joy filed a complaint for contempt and modification, alleging that Carl, who had moved to Florida in April 1988, had refused to pay the monthly mortgage payment, that he was in arrears in his child support in the amount of $125.00, that he had been consistently late with the payments that he did make, that he had refused to pay for Mark's college expenses, that he had refused to make certain medical expense payments, and that he was delinquent on his state income tax, which had placed Joy's qualification for homestead exemption in jeopardy. She further alleged that since the rendition of the final decree there had been a substantial and material change in her circumstances which necessitated an increase in her child support. She alleged that Matt Caldwell had reached age fifteen, with an attendant rise in expenses, and that he was much larger than the average fifteen year old, causing his clothes to be more expensive than normal; and that the rate of inflation had risen once again.
Carl Caldwell counterclaimed, alleging that his income had decreased since the final decree to the point where his child support obligation should be decreased; that his two sons were so hostile to him that he should be relieved of any support obligation for them; that his oldest son, Mark Caldwell, was emancipated and should be declared so; that he had been unable to enjoy visitation with his children and that the court should order specific visitation rights; and that the real property owned by him and Joy Caldwell should be partitioned.
The hearing in this cause was held on October 19, 1989. The court heard testimony from Carl, Joy, Mark, Matt, and Carl's sister Carol Meriwether. The chancellor found that Carl Caldwell was not in wilful contempt of the chancery court's prior order. It also found that there had been no substantial and material change in circumstances since the rendition of the final decree, and Joy Caldwell was not entitled to an increase in child support for Matt Caldwell. The chancellor found that Carl Caldwell still had to pay the same $250.00 per month in support that had been ordered earlier. Carl was also ordered to continue making the mortgage payment. The chancellor found that Mark Caldwell, the elder son, was emancipated and his father had no further duty to support him. The chancellor also ordered that Carl should have the following visitation with Matt: seven (7) days at Christmas, in the Columbus area; two (2) weeks during the summer, taken all at once or split up; and such other visitation as could be worked out between Carl and Matt. Joy Caldwell has appealed, and Carl Caldwell has cross-appealed, from the chancery court judgment.

II.
The burden of proof in a case of civil contempt is by a preponderance of the evidence. Miss. Code Ann. § 11-51-12(4) (Supp. 1990). "The factual findings of the chancery court in a civil contempt case are affirmed unless manifest error is present and apparent." Premeaux v. Smith, 569 So.2d 681, 683 (Miss. 1990).
*546 "The law is well settled that upon establishment of a prima facie case of contempt, the defendant may avoid judgment of contempt by establishing that he is without present ability to discharge his obligation, but he has the burden of proving his inability to pay, and such a showing must be made with particularity and not in general terms." Jones v. Hargrove, 516 So.2d 1354, 1357 (Miss. 1987). Before one may be found in contempt of a court judgment, the judgment must be "complete within itself  containing no extraneous references, leaving open no matter or description or designation out of which contention may arise as to the meaning." Wing v. Wing, 549 So.2d 944, 947 (Miss. 1989). The behavior necessary for a finding of contempt must amount to a willful or deliberate violation of a judgment or decree. Dunaway v. Busbin, 498 So.2d 1218, 1222 (Miss. 1986).
Carl and Joy Caldwell testified to conflict over almost every aspect of support owed by Carl under the final decree. Joy testified that the child support payments came at irregular times, and one support payment of $125.00 had not been made. Carl made that disputed payment just before the hearing to modify, and pointed out that the final decree did not specify any particular day of the month for payment. Joy complained that the mortgage payments had been as much as two months late. Carl, who lived at one address and received his mail at another, stated that he had not received notice from the bank concerning the payment. When he did finally receive notice, he made the payments. Joy alleged that she had been unable to timely file for homestead exemption in 1989, as a tax lien in Carl's name had been placed against the property. She sent notice of the lien to Carl, but he denied ever receiving it. She finally paid the tax lien. Joy testified that she had sent notice to Carl of a $148.00 doctor bill incurred by Matt. She never received any portion of it. Carl testified that he had not received the notice. There were two other medical bills involving Matt, one for $110.00, and one of undetermined amount for a football physical. Joy Caldwell testified that she sent no notice of those, as she did not feel it would do any good.
Carl Caldwell's compliance with the support provisions involving his son Mark is also a matter of controversy. Apparently Carl did not pay Mark's college expense for the 1988-89 school year, as the final decree had ordered. When Joy Caldwell attempted to testify about Mark's medical expenses, Carl objected, saying that he had no legal obligation for that expense. For some reason Joy Caldwell agreed. This was despite the language of the final decree, which states that "[t]he Plaintiff and Defendant will each pay one-half (1/2) of all medical and dental expenses not covered by insurance on the parties' minor children."
Because of the conflicting testimony, and because of admitted lack of notice in some instances concerning support which was owed, we will not disturb the chancellor's finding that Carl Caldwell was not in contempt of the final decree. However, there is a strong inference of disrespect for the orders of the chancery court which is disturbing. The chancellor took some steps to see that the decree would be obeyed in the future. We add the following: this cause is remanded to the chancery court for the purpose of determining exactly what medical and dental expenses Matt and Mark Caldwell have incurred since the final decree which are not covered by Joy's insurance. Carl Caldwell will be required to pay one-half of those expenses, as ordered by the final decree. If there are further problems with delinquent payments, or accusations that certain payments have not been made, the court may at its discretion order that payments be made through the court clerk.

III.
The final decree ordered Carl Caldwell to pay $250.00 per month support for his son Matt. This support award was based on a gross salary for 1987 of $28,762.56, and a net monthly income of $1,735.40, though Carl was actually voluntarily unemployed at the time of the final decree. The figures had changed somewhat *547 by the time of the hearing to modify. Carl Caldwell testified to total assets of $85,035.90, including $10,532.74 and $23,679.72 in two savings accounts. He admitted before trial that he had $18,000.00 in cash or liquid assets, but that figure had been reduced to $13-14,000.00 because of legal fees, dental work for himself, and cash gifts of $250.00 to Matt and $300.00 to Mark. He had voluntarily quit his job and was doing some accounting work for the Dundee Citrus Growers Association at a yearly salary of approximately $18,000.00. He testified to a net monthly income of $1180.74 and monthly expenses of $1372.13. Carl had no housing expenses.
At the time of the final decree Joy Caldwell had a gross monthly income of $950.00 and a net income of $741.25. By the time of the hearing to modify she was earning a gross monthly income of $1172.00, with a net income of $836.66. She alleged expenses of $1720.96 per month. Joy Caldwell testified that she could not survive without a voluntary contribution of approximately $275.00 each month from her sister-in-law, Carol Meriwether. Meriwether had also contributed $2,000.00 for Joy's legal fees.
Joy Caldwell also alleged a change in circumstances due to her son Matt. Matt had turned fifteen, and was driving a 1977 Mercury Cougar, for which Joy provided liability coverage. Even more remarkable was the change in Matt's physical stature since the final decree; at that time he stood 6'3" -6'4" and weighed 225 pounds. By the time of the hearing to modify he stood 6'6" and weighed 258 pounds. Matt is obviously more expensive to feed and clothe than most his age.
"Child support is awarded to the custodial parent for the benefit and protection of the child. Child support benefits belong to the child, and not the parent who, having custody, receives such benefits under a fiduciary duty to hold and use them for the benefit of the child." Cumberland v. Cumberland, 564 So.2d 839, 847 (Miss. 1990). A child support award can be altered if it can be shown that there has been "a substantial or material change in the circumstances of one or more of the interested parties: the father, the mother, and the child or children, arising subsequent to the entry of the decree to be modified." Tedford v. Dempsey, 437 So.2d 410, 417 (Miss. 1983). Some of the factors which may be considered in determining whether a material change has taken place include:
(1) increased needs caused by advanced age and maturity of the children (2) increase in expenses, and (3) inflation factor. Other factors include (4) the relative financial condition and earning capacity of the parties, (5) the health and special needs of the child, both physical and psychological, (6) the health and special medical needs of the parents, both physical and psychological, (7) the necessary living expenses of the father, (8) the estimated amount of income taxes the respective parties must pay on their incomes, (9) the free use of a residence, furnishings, and automobile and (10) such other facts and circumstances that bear on the support subject shown by the evidence. This Court has recognized, however, that a standard of living cannot be imposed upon a father beyond his financial ability to provide. Nor can a court relieve a mother of her obligation to support because she is not now required to work because of a new husband's financial means.
Adams v. Adams, 467 So.2d 211, 215 (Miss. 1985). The finding by the court that there had been no material change, and that the child support award should remain at $250.00 per month, is reviewed under the manifest error/substantial evidence rule. Clark v. Myrick, 523 So.2d 79, 80-81 (Miss. 1988).
Carl argues that his salary has declined drastically from that earned in previous years, although there is more than a hint from the record that this is a voluntary choice of Carl's. Carl argues further that, when using his current salary, and following the guidelines of Miss. Code Ann. § 43-19-101 (Supp. 1990), his monthly support burden should be at least $80.00 less than it is. Joy Caldwell argues that her monthly expenses outstrip her income by *548 approximately $600.00 each month. However, she has received an increase in monthly income since the final decree. It appears that both the parties and this Court would have been better served by a direct appeal from the final decree, rather than a motion to modify. Based on the evidence before us, we find no error in the chancellor's decision to leave Matt Caldwell's child support at $250.00 per month.
Carl Caldwell also makes the argument that his fifteen year old son Matt has so totally abandoned the father-son relationship, and so dislikes his father, that he should no longer have to pay any support for Matt. Matt admitted during the hearing to modify that he felt a great deal of hostility toward his father. Carl relies on the three well-known college support cases, Pass v. Pass, 238 Miss. 449, 118 So.2d 769 (1960); Hambrick v. Prestwood, 382 So.2d 474 (Miss. 1980); Rankin v. Bobo, 410 So.2d 1326 (Miss. 1982). These cases may be distinguished from the situation at bar. First, paying for the extra expense of a child's college education is much different from paying for a child's support. Nichols v. Tedder, 547 So.2d 766, 769 (Miss. 1989). Second, a fifteen year old high school student is somewhat different that a young adult of college age. Carl also relies on Roe v. Doe, 29 N.Y.2d 188, 324 N.Y.S.2d 71, 272 N.E.2d 567 (1971); Merl v. Merl, 110 A.D.2d 887, 488 N.Y.S.2d 440 (1985), rev'd on other grounds, 67 N.Y.2d 359, 502 N.Y.S.2d 712, 493 N.E.2d 936 (1986); Parker v. Stage, 43 N.Y.2d 128, 400 N.Y.S.2d 794, 371 N.E.2d 513 (1977). Both Roe and Parker involve children of college age; Merl is also distinguishable on its facts. We find that the better rule, and the closest to the view that this Court has previously expressed, can be found in Holston v. Holston, 58 Md. App. 308, 473 A.2d 459 (1984), cert. denied, 300 Md. 484, 479 A.2d 372 (1984), which states:
The amount of money that the noncustodial parent is required to pay for the support of his minor children should not be determined by the amount of love the children show toward that parent. The proper inquiry, as we have often stated, is what is in the best interest of the child. In reaching that conclusion, the chancellor must balance the needs of the child against the parent's financial ability to meet those needs.
Holston, 473 A.2d at 463. It is not suggested that there could never be a situation where a minor child as young as fifteen might by his actions forfeit his support from a non-custodial parent. Those actions would have to be clear and extreme, and they are not present in the case at bar. In fact, to the contrary, young Matt has sought professional counseling and advice to deal with his feelings toward his father and openly talks of trying to improve the relationship.

IV.
Carl Caldwell was ordered in July 1988 to pay for Mark Caldwell's college expenses and his car insurance. No specific amount was mentioned. The opinion which accompanied the final decree found that Mark's college expenses for 1987 amounted to $200.00 per month. Mark testified that when he called his father for money for the 1988-89 school year, Carl told him that money was scarce, and asked him if he really wanted to go to school or stay out and work full-time. Mark felt that his father was attempting to discourage him from going to school. Mark had already begun to work for Baldor Electric in the summer of 1988, and when no funds for college were forthcoming, he stayed on with Baldor, becoming a full-time employee in June of 1989. Mark earned a salary of $6.23 per hour with Baldor. He generally worked a forty-hour week, plus eight to sixteen hours of overtime per month. His expenses included a monthly payment of $188.00 for a new truck, purchased in September 1989. He lived at home, and Joy Caldwell cooked and cleaned for him, bought his groceries and did his laundry. He did not contribute to the household expenses. He did attend East Mississippi Community College part-time, at his own expense. The chancery court found that Mark was emancipated and his father had no further duty to support him in any manner.
*549 Emancipation has been defined by this Court as follows:
Emancipation, as employed in the law of parent and child, means the freeing of a child for all the period of its minority from the care, custody, control, and service of its parents; the relinquishment of parental control, conferring on the child the right to its own earnings and terminating the parent's legal obligation to support it.
Pass v. Pass, 238 Miss. 449, 454, 118 So.2d 769, 771 (1960). It is further stated in 67A C.J.S. § 5 (1978), p. 175, that "[e]mancipation has also been defined as the grant by a parent of the right to the services and control of a minor child. In a general sense, parental emancipation signifies a surrender and renunciation of the correlative rights and duties touching the care, custody, and earnings of the child." This Court further stated, in Pearson v. Hatcher, 279 So.2d 654, 656 (Miss. 1973), that a daughter who had married had become emancipated and her father was relieved of the legal duty for her support. More recently, in Duncan v. Duncan, 556 So.2d 346 (Miss. 1990), the chancery court found that the eighteen year old daughter of the Appellant was not emancipated. As she was a college student, the chancery court ordered $300.00 per month in support. This Court affirmed, saying that the daughter "was 18 years of age at the time of the hearing of this cause, [and] was not then emancipated. She did not work full time and her earnings were insufficient to provide the necessities for her continued education. She was enrolled as a student at Mississippi State University, and her record as a student was acceptable." Duncan, 556 So.2d at 348.
It is clear from the record that Carl Caldwell simply did not comply with the court's order that he pay his son's college expenses. Though some of the evidence supports a finding of emancipation, Carl Caldwell ignored the final decree, in effect forcing his son to abandon his schooling and become a full-time worker, and then sought to have Mark declared emancipated to his financial benefit. The finding of emancipation is reversed and rendered. Carl Caldwell will abide by the terms of the final decree and pay for his son's college expenses as ordered. The amount owed will include expenses for years Mark could have attended school but was unable to because of lack of funds, such as 1988-89.

V.
Carl Caldwell was granted the following visitation rights with his son Matt: seven days at Christmas in the Columbus area; two weeks during the summer, taken altogether or split up; and such other visitation as could be worked out between Carl and Matt. Carl alleges that the chancellor erred in this provision; the request is for more visitation, set at specific times.
The general rationale behind visitation for a non-custodial parent was stated in Cox v. Moulds, 490 So.2d 866, 870 (Miss. 1986):
[T]he chancellor should approach the fixing of visitation rights with the thought in mind that, absent extraordinary circumstances militating to the contrary, the non-custodial parent will during the periods of visitation have broad authority and discretion with respect to the place and manner of the exercise of same, subject only to the time constrictions found reasonable and placed in the decree. Overnight visitation with the non-custodial parent is the rule, not the exception; indeed, a non-custodial parent is presumptively entitled during reasonable times to overnight visitation with the children. The approach we mandate is based upon the premise of our law in this area: that children of divorced parents should be encouraged to have a close, affectionate and, under the circumstances, as normal as possible a parent-child relationship.
"The specification of times for visitation rights is committed to the broad discretion of the chancellor." Clark v. Myrick, 523 So.2d 79, 83 (Miss. 1988). The court is not bound by the wishes of a child as to the provisions for visitation. Ross v. Segrest, 421 So.2d 1234, 1236 (Miss. 1982).
In a recent case, In re Marriage of Smith, 555 So.2d 73 (Miss. 1989), the non-custodial *550 parent, a resident of Alabama, was granted visitation at the home of a grandparent, from 9:00 a.m. Saturday to 5:00 p.m. Sunday, two weekends per month. The children involved were ages nine and seven. This Court reversed, finding that the visitation provision was not reasonable. Smith, 555 So.2d at 76.
Carl Caldwell voluntarily moved to Florida, which makes regular visitation more difficult. Matt testified that his father did not inform him of the move until after the fact; Carl says that he did. Carl chooses to live in a home which is several levels below what he can actually afford, and provided little or no testimony about the features of the home which might be conducive to visitation. Matt testified that he disliked his father; some bitterness should be expected when a father files suit to sell his son's home out from under him, and attempts in the same proceeding to end all support for him. If the relationship between father and son improves any during the visitation which has been ordered, then they are free to increase their time together on their own. We find no abuse of discretion in the visitation provisions. The portions of the lower court judgment dealing with contempt, child support and visitation are affirmed. The finding of emancipation is reversed and rendered. The cause is remanded for a hearing on the medical expenses incurred by Mark and Matt Caldwell since the rendition of the final decree and for college expenses for Mark from the rendering of the original decree.
AFFIRMED IN PART, REVERSED AND RENDERED IN PART, AND REMANDED ON DIRECT APPEAL; AFFIRMED ON CROSS APPEAL.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, SULLIVAN, BANKS and McRAE, JJ., concur.
PRATHER, J., concurs in part and dissents in part.
PRATHER, Justice, concurring in part and dissenting in part:
I respectfully dissent to that portion of the majority opinion addressing child support for the fifteen year old son, Matt. It is my view that the chancellor was manifestly in error in finding no change in circumstances in Matt's support needs. The majority opinion recites the mother's proof of (1) Matt's eligibility to drive a motored vehicle and need of car insurance, which for a fifteen year old male is very expensive, (2) his advanced age and maturity, (3) his increase in physical stature to 6 feet 6 inches in height, and weight of 258 pounds and (4) increase of inflation. Additionally, the mother's expenses exceeded her resources. The father's monthly income had decreased; however, he had some $85,000 in assets including two savings accounts. It is my view that the mother sustained her burden of proof and that she should have been awarded an increase in Matt's child support payment. On this point only, I would dissent; I would concur in the remainder of the opinion.
On remand, I would direct the chancellor to review Matt's need for increased support.