IRVING, J.,
for the court.
¶ 1. The Department of Human Services (DHS) appeals from an order of the Chancery Court of Smith County suspending future child support based on a finding that there was an absence of a father-son relationship. DHS argues that suspension is too extreme and should be taken only in the most egregious circumstances and only after less severe remedies have been attempted and proven futile. Ronald Marshall cross-appeals from an order awarding payment of child support arrearage. Marshall contends that no arrearage exists due to the deprivation of his due process rights.
¶ 2. We find no fault with the chancellor’s decision; therefore, we affirm the judgment.
FACTS
¶ 3. Ronald Marshall (Ron) and Anita Dawn Collins (Dawn) were married in Alabama on August 20, 1984. One child was born to the marriage on June 8, 1986, Ronald Marshall, Jr. (Ronnie). Ron and Dawn separated after four years of mar *443 riage while the couple resided in Baltimore, Maryland. Dawn and Ronnie returned to Alabama, and Ron relocated to California. On or about October 27, 1989, Ron filed a petition for divorce from Dawn in Los Angeles County, California, and in the divorce petition, it was noted that child support was to be awarded to Dawn. However, the final judgment of divorce made no mention of Ronnie or the matters of child support, custody, and visitation.
¶ 4. On September 11, 1990, before the divorce was finalized, Dawn, who was now living in Smith County, Mississippi with her mother, Sybol Anding a/k/a Johnnie Anding, signed an affidavit giving Sybol temporary custody of Ronnie. Dawn affirmed that she was giving Sybol temporary custody of Ronnie until she could “more adequately and properly” provide for Ronnie. Sybol sought the assistance of DHS in acquiring child support for Ronnie.
¶ 5. As a result of Sybol’s request for assistance, the State of Mississippi, by and through DHS on May 12, 1998, initiated a Uniform Reciprocal Enforcement and Support Act (URESA) request that California establish a child support order requiring Ron to provide medical coverage for Ronnie and pay child support to Sybol for Ronnie. On June 12, 1996, a California court ordered Ron to pay $622 monthly in child support. The boilerplate order stated that the matters were uncontested because Ron, the defendant, made no appearance in the court.
¶ 6. On May 25, 1999, Ron filed, in the Chancery Court of Smith County, Mississippi, a motion for modification of child custody and for modification of child support, along with a petition to reconsider child support. As a result of these filings, the chancery court appointed a guardian ad litem for Ronnie.
¶ 7. In the motion and petition, Ron stated that he was a resident of Virginia and that he was seeking modification of the child custody order and requesting that he receive primary physical custody of Ronnie. Ron also sought to have child support arrearage reduced and/or terminated due to the fact that he was unable to locate, call, or visit with Ronnie.
¶ 8. Upon the hearing of Ron’s motion and petition, the court found that Ron had a duty to support Ronnie. On August 19, 1999, a temporary order was filed granting Sybol temporary custody of Ronnie. The chancellor found that Ron did not know Ronnie’s physical location until March 1998. The temporary order also gave Ron reasonable visitation with Ronnie and set the amount for child support at $588 per month. The issue of arrearage was reserved by the chancellor for a later determination.
¶ 9. Ron visited Ronnie on two occasions after re-establishing contact with his son. The first visit was a one-day visit in the summer of 1999, and Ron described it as a great time. However, the second visit, in the summer of 2000, was much different. That visit lasted a little over two days and was described by Ron as not so great.
¶ 10. Due to the disdain Ronnie exhibited toward Ron during the second visit, Ron filed a motion for psychological evaluation, citing the reason for such being Ronnie’s “behavior exhibited during the scheduled visitation with his father.” The court entered an order for psychological evaluation.
¶ 11. After the evaluation was completed, the chancellor held a hearing in which he determined a substantial and material change in circumstances had occurred between Ron and Ronnie and “as a result of said material change in circumstances there [had] been a break down [sic] in the relationship between” them. The chancellor went on to state “[t]his break down *444 [sic] was caused partially as a result of the father moving off and not having contact with his child, even though this court understands that he made attempts to find the child, but also because of the actions of the mother and grandmother with this child.” Because of this breakdown, the chancellor suspended all visitation and all child support obligations of Ron. As to the issue of back child support, the court stated, “the Department of Human Services of Smith County, MS, shall enter into an order with Mr. Marshall to collect any child support payments that are due for the benefit of the minor child.”
¶ 12. As already observed, DHS has appealed the suspension of the child support payments, and Ron has cross-appealed the order of child support arrearage and child custody. There is no evidence in the record of DHS entering into an order as mandated by the court regarding the alleged child support arrearage. The chancellor later entered a judgment of child support arrearage, ordering Ron to pay the amount of $22,000.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Did the Chancellor Err in Suspending Child Support Payments?

¶ 13. The standard of review utilized in domestic relations cases is well settled in Mississippi. A chancellor’s ruling will remain undisturbed unless there is a showing of manifest error. Westbrook v. Oglesbee, 606 So.2d 1142, 1146 (Miss.1992). “The chancellor, by his presence in the courtroom is better equipped to listen to the witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses.” Murphy v. Murphy, 631 So.2d 812, 815 (Miss.1994).
¶ 14. The issue we face here was addressed in 1991 in the case of Caldwell v. Caldwell, 579 So.2d 543 (Miss.1991). The Caldwell court held that the amount of money the non-custodial parent is required to pay for the support of his minor child is not determined by the amount of love shown by the child toward the parent but instead by a determination of what is in the best interest of the child. Id. at 548. There must be a balancing test performed where the child’s interest is weighed against the non-custodial parent’s ability to pay. Id. Yet the Caldwell court went on to state that there may be situations where a child may forfeit his support but those actions must be “clear and extreme.” Id.
¶ 15. The Caldwell test is one which should be left to the chancellor’s discretion absent manifest error. Westbrook, 606 So.2d at 1146. This Court held in the case of Roberts v. Brown, 805 So.2d 649 (Miss.Ct.App.2002), that the test had been met. In that case, the non-custodial parent had been charged with raping his daughter and was later acquitted. Id. at 650-51 (¶ ¶ 5-9). Subsequently, the father and daughter did not visit with each other for five years. Id. at 651 (¶ 9). Specifically, the father contended that the father-daughter relationship had been abandoned and that abandonment, plus the accusation of rape made by the daughter, was clear and extreme enough to constitute a forfeiture of child support. Id. at 653-54 (¶¶ 17-20).
¶ 16. The chancellor found that the deteriorated relationship between Ronnie and Ron was extreme enough so as to extinguish Ron’s financial support obligations. Ron was denied access to his son for over twelve years, and when he was afforded the opportunity to visit with Ronnie in Mississippi, those visits did not facilitate a better relationship. Duly, when Ron sought to have Ronnie visit him Virgi *445 nia, he was denied that privilege. Additionally, the guardian ad litem in the instant case reported to the chancellor that:
Ronnie does not know his father and because of his unfamiliarness with him, he is reluctant to get to know him.... He [Ronnie] may feel that he is being disloyal to his grandmother when he spends time with him [Ron]; or he may be afraid that his father will take him away from the only parent he has ever known.
¶ 17. Based on the evidence presented to the chancellor, we conclude that the chancellor did not manifestly err in suspending Ron’s obligation for future child support payments. The chancellor “is better equipped to listen to the witnesses, observe their demeanor, and determine the credibility of the witnesses and what weight ought to be ascribed to the evidence given by those witnesses.” Murphy, 631 So.2d at 815. Finding no error, we affirm the chancellor’s order suspending child support.
2. Did the Chancellor Err in Awarding Child Support Arrearage ?
¶ 18. Ron argues that the chancellor erred in awarding child support arrearage. His argument is twofold: (1) no process was issued for him nor notice given to him regarding the change of custody of Ronnie from Dawn to Sybol, and (2) Dawn and Sybol denied him access to Ronnie for twelve years.
¶ 19. We are perplexed that Ron would argue that he should have been given notice regarding a modification of custody that did not legally occur. While it is true that Dawn gave temporary custody of Ronnie to Sybol, this was an extrajudicial arrangement well before DHS became involved in the case. We examined the record and did not find any instance where DHS, Dawn or Sybol initiated a custody or support modification. Quite to the contrary, the only modification of custody and support was initiated by Ron, and in his petition, he acknowledged that the chancery court possessed jurisdiction of the parties and of the subject matter.
¶ 20. Ron’s second contention— that no arrearage should be assessed because Dawn and Sybol denied him access to the child — is without merit. Child support is for the benefit of the child, and a child should not be penalized because of the conduct of the parents. Moreover, the chancellor determined that the breakdown in the relationship or the non-contact between Ronnie and Ron was caused partially by Ron’s own action in moving away from the child. We cannot say that the chancellor was manifestly in error in ordering Ron to pay the child support ar-rearage.
¶ 21. THE JUDGMENT OF THE SMITH COUNTY CHANCERY COURT IS AFFIRMED ON BOTH DIRECT AND CROSS-APPEAL. STATUTORY PENALTIES AND INTEREST ARE ASSESSED AGAINST THE APPEL-LEE/CROSS-APPELLANT. COSTS OF THIS APPEAL ARE ASSESSED ONE HALF TO APPELLANT/CROSS APPELLEE AND ONE HALF TO AP-PELLEE/CROSS-APPELLANT.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND GRIFFIS, JJ, CONCUR.