MYERS, P.J.,
 

 for the Court:
 

 ¶ 1. Timothy Craft (Tim) appeals a final judgment entered by the Jones County Chancery Court on January 6, 2009, which awarded his former wife, Donna Craft, primary custody of their three minor children, allowing Tim supervised visitation with the children at the Department of Human Services (DHS) in Jones County each Friday from 3:30 p.m. until 5:00 p.m. The judgment further ordered, inter alia, that Tim pay Donna $243 per month in child support, $100 per month in permanent periodic alimony, and $17,859 in attorney’s fees in addition to the $4,438 in attorney’s fees previously ordered by the chancery court on March 7, 2008. Finding no reversible error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Tim and Donna were married in 1991. Three children were born of this marriage — Sean, born in 1993; Alayna, born in 1994; and Lance, born in 1997. Tim and Donna separated in January 2005, and Donna filed for divorce in the Chancery Court of Forrest County on February 11, 2005, alleging habitual cruel and inhuman treatment, adultery, and, in the alternative, irreconcilable differences. Tim filed for divorce in Jones County, Mississippi, on February 22, 2005, alleging habitual cruel and inhuman treatment, adultery, and, in the alternative, irreconcilable differences. Donna’s complaint was dismissed for lack of subject-matter jurisdiction. She then timely filed an answer to Tim’s complaint, and she counterclaimed for divorce and filed a motion for temporary relief, alleging the same grounds asserted in her initial complaint.
 

 ¶ 3. During this time frame, the record is unclear exactly when, Tim was fired from his job at Delphi, where he worked in management as an industrial engineer. Also fired from Delphi, was Tim’s co-worker, Lola Hulsey. According to the record, Tim had been having an adulterous affair with Lola since the year 2000. Donna testified that she had suspected that Tim was having an affair with someone, but she was not positive. Donna said her suspicions were confirmed by law enforcement and a photograph of Tim and Lola together. Shortly after Tim was terminated from Delphi, Tim was arrested by the Jones County Sheriffs Department and charged with four counts of child exploitation in violation of Mississippi Code Annotated section 97-5-33 (Supp.2009). Lola also was arrested and similarly charged. The chancery court thereafter issued a temporary order granting Donna temporary custody of the children, which allowed Tim only supervised visitation at DHS for one hour, every other week. The order required Tim to pay Donna $352 per month in child support.
 

 ¶ 4. In June 2005, Tim filed a motion to enlarge visitation, in which he requested that he be granted standard visitation with
 
 *1235
 
 his children and that he be granted “makeup time.” Following his termination from Delphi, Tim, who was a United States Navy reservist at the time, went on active duty and traveled the country as a Naval instructor.
 
 [1]
 
 According to Tim, his travel schedule and DHS’s holiday schedule caused him to lose visitation time with his children.
 

 ¶ 5. Donna thereafter requested and was granted a continuance, and the case was set for trial to begin in August 2005. On July 22, 2005, Tim’s legal counsel filed a motion to withdraw from the matter after Tim informed her that she was responsible for the loss of his “parental involvement.” The motion was granted, and Tim was given time to hire new counsel. Tim’s current counsel filed an entry of appearance in September 2005 and immediately filed a motion to modify the temporary order issued by the court in April 2005, with the motion to enlarge visitation still pending.
 

 ¶ 6. In December 2005, an agreed order was entered (consolidated with a petition to establish grandparent visitation — a copy of which is not included in the record) establishing visitation for Tim at his parents’ home under their supervision. The order instructed, inter alia, that the children were not to be exposed to any immoral or illegal conduct or any negative comments by any party against the other.
 

 ¶ 7. In May 2006, Tim filed a motion for review of that order, in which he requested the removal of all restrictions on his visitation. The chancery court issued a temporary order in June 2006, granting Tim and Donna joint legal custody of their three minor children. Tim was awarded standard unsupervised visitation with the ehil-dren. The order allowed Tim to supply the children a cell phone, so Tim and his parents could have reasonable telephone contact with the children.
 

 ¶ 8. A trial on the merits was held on August 22, September 6, and October 11, 2006. Tim did not contest Donna’s allegations of adultery, and the parties stipulated to a division of the marital property. The proceedings dealt primarily with the issue of custody, and the parties presented an extensive amount of testimonial and documentary evidence to the chancery court for its evaluation of the
 
 Albright
 
 factors.
 
 [2]
 
 On October 31, 2006, the chancery court entered a final judgment, granting Donna a divorce on the ground of adultery, with all other matters (custody and visitation, child support, alimony, and attorney’s fees) to be taken under advisement.
 

 ¶ 9. In November 2006, Tim filed an emergency motion alleging that Donna was interfering with both his visitation and phone contact with the children. The chancery court issued an order establishing holiday visitation for Tim with the children. In January 2007, Tim filed a motion to reopen evidence, which again included allegations of Donna’s interference with visitation. He also requested that he be allowed to claim the children as dependants for income-tax purposes. A hearing was held on the matter, and the chancery court thereafter issued an order granting Tim’s motion to reopen evidence. The court also designated a specific time period for phone visitation and established spring-break visitation for Tim with the children; the court found that there was insufficient evidence to find Donna in contempt.
 

 
 *1236
 
 ¶ 10. On October 5, 2007, Tim was arrested by the Lamar County Sheriffs Department and charged with four counts of child exploitation, including sexual battery of a minor child in violation of Mississippi Code Annotated sections 97-5-38 and 97-3-95 (Rev.2006). According to the record, Tim had entered into an immunity agreement with the district attorney’s office in Jones County in March 2006, with the consent of the district attorney’s office in Lamar County. In exchange for Tim’s cooperation in the State’s investigation of Lola, the district attorney agreed to dismiss the child-exploitation charges, which Tim had been arrested for in 2005. Under the terms set forth in the agreement, Tim was to turn over certain video and/or photographic evidence to the district attorney’s office, either in his possession or which may come into his possession, “which may contain child pornography or any representation thereof including but not limited to preservations containing images of Lola Marie Hulsey and any minor child regardless of where the images were made or how [Tim] came into possession of same.” Tim also agreed to testify against Lola if the matter went to trial.
 

 ¶ 11. Despite the gravity of the situation, Tim and Lola continued to see each other romantically. In July 2006, after having been hired as a truck driver in March of that year by BJ Services out of Columbia, Mississippi, Tim was sent to Willowbrook, Texas by BJ Services for engineering training. In violation of her bond agreement, Lola rode a bus out to Texas. Tim picked her up at the bus station, and the two of them spent approximately four days together at the La Quin-ta Inn where Tim was staying. Sometime during this period, Tim wrote out several statements on hotel stationary, which he signed and dated, describing in explicit detail sexual acts committed by him with Lola’s six-year-old daughter. In one of the notes, Tim proclaimed Lola’s innocence of the criminal charges she was facing in Jones County and Lamar County. Tim later admitted to writing the statements, but he vehemently denied their truth. According to Tim’s testimony in chancery court, he wrote the statements at the behest of Lola, and he was intoxicated and under the influence of approximately a dozen Dramamine pills when he wrote them. Tim stated that Lola had taken his knife from him and was scraping the skin on his arms, “to wake [him] back up so that [he] could write” the statements. Tim claimed that he ripped up the notes the following morning after he awoke and came to his senses. The notes, however, eventually were turned over to authorities in Mississippi.
 
 [3]
 

 ¶ 12. Following Tim’s arrest, Donna filed a motion to reopen evidence on October 22, 2007. A hearing was held in the chancery court on November 6, 2007, at which time Tim presented a motion requesting that Donna be held in contempt for interfering with visitation, and he requested that the court modify its temporary order. The chancery court issued an order rescheduling the matter for a hearing on the prior motions. The court also ordered that Tim’s and his parents’ visitations with the children be supervised at DHS every other Friday from 3:30 p.m. until 5:00 p.m.
 

 ¶ 13. A hearing was held in March 2008. Additional evidence was presented to the chancery court for its determination on the remaining undecided issues. On April 11, 2008, the chancery court issued an order finding Tim to be a less-than-credible witness, and that the allegations
 
 *1237
 
 pending against him were very serious. Accordingly, the court ordered that the supervised visitations set forth in the court’s previous order were to remain in effect. The chancery court ordered Tim to pay Donna $359 per month in child support, and the court awarded Donna $4,437 in attorney’s fees. The court also found Donna not to be in contempt.
 

 ¶ 14. In May 2008, Tim filed a motion for modification of the April 11 order, requesting the children’s attendance at his wedding to his current wife and that his child-support obligation be reduced because of his termination from B J Services. Tim also filed a motion for the court to make specific findings of fact and conclusions of law and to enter a final judgment in the matter. The chancery court issued an order stating that a final judgment with specific findings of fact and conclusions of law was forthcoming. The court also modified its previous order to allow the children to attend Tim’s wedding, and it ordered Tim to provide proof of his current income.
 

 ¶ 15. The chancery court issued a final judgment on January 8, 2009. The court granted Donna primary physical custody of the minor children. The court ordered that Tim shall continue to have supervised visitation with the children at DHS in Jones County each Friday from 3:30 p.m. until 5:00 p.m. The court ordered Tim to pay Donna $243 per month in child support and one-half of all health-related expenses. Donna was awarded $100 per month in permanent periodic alimony and $17,859 in attorney’s fees, in addition to the $4,438 amount previously ordered in attorney’s fees.
 

 ¶ 16. Feeling aggrieved, Tim argues that the chancery court erred by (1) restricting his visitation to one day per week for one-and-a half hours; (2) awarding Donna alimony; (3) refusing to find Donna in contempt of court for her willful and malicious interference with his visitation with their children; and (4) awarding Donna attorney’s fees.
 

 STANDARD OF REVIEW
 

 ¶ 17. Appellate review of domestic-relation matters is limited.
 
 Carrow v. Carrow,
 
 741 So.2d 200, 202 (¶ 9) (Miss.1999). We will not reverse the judgment of a chancellor unless the chancellor abused his discretion, was manifestly in error, or applied an erroneous legal standard.
 
 Id.
 
 (citation omitted). This is especially true when dealing with areas of divorce, alimony, and child support.
 
 Sumrall v. Munguia,
 
 757 So.2d 279, 282 (¶ 12) (Miss.2000).
 

 DISCUSSION
 

 I. Restricted Visitation
 

 ¶ 18. Tim submits that the chancery court’s imposition of a visitation period restricted to one day a week for one-and-a half hours was manifest error and an abuse of discretion. Tim contends that the highly-restricted visitation was ordered despite undisputed testimony that he is a good father and has never created any apprehension of harm toward his children. Citing to
 
 Cox v. Moulds,
 
 490 So.2d 866, 868 (Miss.1986), Tim points out that “the visitation rights of the non-custodial parent should be tantamount to custody with respect to the place and manner of exercise of same, except in the most unusual circumstances[,]” that is — “something approaching actual danger or other substantial detriment to the children.... ”
 

 ¶ 19. In domestic-relation matters, as with other issues concerning children, our chancellors enjoy considerable discretion with visitation issues.
 
 Harrell v. Harrell,
 
 231 So.2d 793, 797 (Miss.1970). When determining visitation, the best in
 
 *1238
 
 terest of the child is the main concern, “keeping in mind the rights of the noncustodial parent and the objective that parent and child should have as close and loving a[sic] relationship as possible, despite the fact that they may not live in the same house.”
 
 White v. Thompson,
 
 569 So.2d 1181, 1185 (Miss.1990) (citing
 
 Cox,
 
 490 So.2d at 870). Accordingly, this Court affords great deference to a chancellor’s decision regarding visitation.
 
 Id.
 

 ¶ 20. We find no indication in the record that Tim and Donna’s three minor children have ever been subjected to physical harm while in Tim’s care. Sean and Alayna, the two oldest children, testified extensively in this case, on multiple occasions. Both children, who were aware of Tim’s legal troubles, expressed their love and affection for both parents, and they consistently stated that neither parent had ever abused them. Both stated, however, that they preferred to live with Tim. This is because, in their opinion, Tim is a better role model than Donna, and he is someone they can look up to. According to the children, Tim is more outgoing than Donna; he is more open-minded than Donna; and, he is more “intelligent” than Donna.
 

 ¶ 21. According to the record, Tim sent Sean well over a hundred e-mails pertaining to the divorce case. Though Sean denied ever reading the e-mails, he admitted that his father did indeed send them. While on cross-examination, Tim testified as follows:
 

 Q. Did you send — ever say that Donna doesn’t deserve the children in an e-mail that you sent?
 

 A. It’s my opinion she doesn’t. So if I sent that e-mail, that’s exactly what I said.
 

 Q. Did you say that Donna was a petty, bitter prune in an e-mail you sent to Sean?
 

 A. I don’t know if I said that in an email, but that’s very descriptive.
 

 Q. Did you talk to Sean about moving out of state in an e-mail that you sent to him?
 

 A. I have no recollection of that either, ma’am. I’m sorry.
 

 Q. Did you ever refer to Donna as an idiot in an e-mail you sent?
 

 A. Ma’am, I’m — again, I’m sorry. I don’t know every e-mail I’ve ever forwarded. I’m an extremely busy man trying to recover my life.
 

 Q. Did you ever say that Donna deserted the family?
 

 A. She did desert the family.
 

 Q. And that she will be hated by the children forever?
 

 A. She’s hated by the children now.
 

 [[Image here]]
 

 Q. Did you say that Donna’s [hatred] for you has turned the children against her?
 

 A. That’s a common saying between me and the children, ma’am. I don’t know if I said it or not.
 

 Q. Did you ever ask the children to find out who Donna sees?
 

 A. I wouldn’t say that I asked the children. We’d had discussions in our visitations about, you know, why she would leave a loving home that was excellent for everybody involved except for her selfishness, and we tried to figure that out.
 

 Q. Did you ever ask the children to see what medication she was on after the separation?
 

 A. I received a doctor’s consultation at my [P.O. Box] ... referring Donna to psychiatric help.
 

 [[Image here]]
 

 Q. Did you ask the children to find out what medications Donna was on?
 

 
 *1239
 
 A. No, ma’am, I don’t believe I did. And if I do [sic], I don’t recall. We talked about her being on medication.
 

 Q. All right. Then you can — if you want to still explain your answer, you may do so.
 

 A. I had — like I said, a letter had come to the P.O. Box that we shared after she left us[,] and it referred her to psychiatric counseling. And I was concerned about my children. If she was on some medicine that I felt to be dangerous to the children, I felt I had a reason to know that.
 

 THE COURT: The answer is, yes, you did discuss it with the children?
 

 A. Yes, sir.
 

 [[Image here]]
 

 Q. How did you foster the idea in the children that their mother is not intelligent?
 

 A. The children have told me that their mother can’t help them with their math homework. I have fostered the idea that she’s not good in math, yes. As far as not being intelligent, I wouldn’t go that far. She’s not very good at math. Q. And that’s the reason you should have custody of them?
 

 A. No, ma’am. That’s one of several reasons.
 

 ¶ 22. The aforementioned is illustrative of one of the themes permeating throughout the record before this Court, which— politely — can best be described as “the best defense is a
 
 flailing
 
 offense.” As noted in the facts, coinciding with this case, was a serious criminal matter in which Tim, to whatever extent, was involved. Mindful of the potentiality of Tim having to defend himself in a criminal proceeding, the chancellor exercised caution throughout this case to ensure that Tim’s constitutional rights were safe guarded, while simultaneously carrying out the responsibilities ascribed to him and his court. For various reasons, we are without a full picture of the facts surrounding the criminal matter. Not surprisingly, Tim often refused to answer questions touching on the subject.
 
 [4]
 
 We certainly notice, however, the numerous innuendos that Tim still managed to get into the record, despite his Fifth Amendment invocations, obviously, for the purpose of insinuating that his troubles in the criminal matter were the result of some sort of scheme orchestrated by Donna. The chancellor did not believe any of it, and the record fully supports the chancellor’s conclusion. What clearly caused concern for the chancellor, however, was the likelihood of Tim having involved the children — wittingly or not — in his transparent case against Donna.
 

 ¶ 23. At a subsequent hearing, Sean was again called to testify on behalf of Tim; the record discloses the following testimony by Sean outside the presence of his parents:
 

 Q. All right. What — since October— [sic] your mother have a computer at her house?
 

 A. Yes, she does.
 

 Q. What have you found on that computer?
 

 A. Actually, I found a — it was a child pornography picture. It was of — I could identify the person as Lola Holsey [sic], because my mother had once shown me a picture of her in the newspaper. I couldn’t identify the ... man, but there
 
 *1240
 
 was also a child’s foot up in the — I believe it was the top right-hand corner.
 

 Q. Did you say something to your mother about that picture being on the computer?
 

 A. I didn’t tell her about that. It surprised me. I wasn’t expecting it on her computer.
 

 ¶ 24. On cross-examination, Sean testified as follows:
 

 Q. I would like to know what were you doing running across anything on your mother’s computer.
 

 A. Actually, I was just placing on the— I think it’s a web site creator, because I’m — I guess I love computers[,] and it asked me for an insert, like a picture onto my file, and naturally I just accepted it. I went through the list looking at pictures I could choose[,] and one of them had the file name oasis and that appealed to me because it just [sic] it sounded like a code name, so I clicked on it[,] and it brought up that picture. It was actually just [sic] coincidence that I ran across it.
 

 Q. And that was the picture of Lola Holsey [sic]?
 

 A. Yes, ma’am.
 

 Q. And she was naked?
 

 A. Yes, ma’am.
 

 Q. And do you believe that your mother put that on the computer?
 

 A. Yes, ma’am.
 

 Q. Do you know who Lola Holsey [sic] is?
 

 A. My mother actually showed me a picture of her in the newspaper. So, yes, I do.
 

 Q. And who is she?
 

 A. She’s a person that my father had [sic] cheated with.
 

 Q. Right.
 

 A. Yeah.
 

 Q. And do you know what she’s charged with?
 

 A. I couldn’t state that.
 

 Q. She’s charged with sexual exploitation of a minor child. She’s in jail in Lamar County.
 

 A. Okay.
 

 Q. And you’re not trying to tell the Court that your mother put that picture on the computer? •
 

 A. Yes, that’s what [sic] I don’t know who else could have.
 

 Q. But you don’t have any knowledge that she put it on there.
 

 A. She’s the only one that has access to it. And I certainly didn’t do it.
 

 THE COURT: Was there a computer in your home while your parents were living together?
 

 A. Yes, sir.
 

 THE COURT: That answers the question.
 

 ¶ 25. After Sean testified, Tim took the stand. The following discussion occurred during direct examination:
 

 Q. Tim, we filed a motion to reopen the evidence to allow the Court to hear what’s occurred since October 11, 2006. What other information do you have to show the court?
 

 A. Well, there’s — you know, in addition to the stonewalling that I’m getting, the fact that I was told my life would be hell and [Donna’s] doing everything to make my life hell. We — Sean came to me with a CD ROM that he’d taken a picture [sic] from her computer that was pornographic. He wasn’t happy to be exposed to it. He wanted to know what he should do about it, and I didn’t know.
 

 THE COURT: Let me ask you a question. Who took that picture?
 

 
 *1241
 
 A. I have no idea. I have no idea, Your Honor. And I haven’t seen that picture before.
 

 THE COURT: Your son has testified that it was your ex-lover.
 

 A. It’s quite possible.
 

 THE COURT: Did you not admit that you have taken photographs of your ex-lover?
 

 A. I have. I also know for a fact that other people [sic] she’s been a model since she was seventeen.
 

 THE COURT: All right.
 

 A. But that picture, I did not [sic],
 

 THE COURT: Are you suggesting to the Court that your ex-wife put that photograph on her computer?
 

 A. I have suggested to the Court that my ex-wife has put those pictures everywhere. They act [sic] including her father’s house on his home computer.
 

 THE COURT: Well, apparently you’ve still got some of them buried out on the farm in Sandy Hook too.
 

 A. I have a CD ROM of Donna that I will provide to the Navy, yes, sir.
 

 THE COURT: Okay. I think I’ve heard enough about all this pornography-
 

 ¶ 26. Another concerning factor for the chancellor, was a note entered into evidence, written by Tim’s mother, Ms. Cecile Craft, to Alayna. It reads, in part, as follows:
 

 “Sweetheart, I miss you all so much and I’m so sorry we are unable to visit here. It should not be this way. But remember the old saying, what goes around comes around. God gives the revenge and He can deal.”
 

 The following discussion transpired between the chancellor and Ms. Craft, with regard to the note:
 

 THE COURT: Explain to me what this — what the old saying [sic] “what goes around comes around” means.
 

 [[Image here]]
 

 A. Well, it’s an old saying I’ve heard all my life. And when something goes bad, ... it’s usually a cycle and it just comes around.”
 

 [[Image here]]
 

 THE COURT: — first one that started it. And that would be her mother. Is that who you were referring to?
 

 [[Image here]]
 

 A. I suppose it is; yes, sir.
 

 THE COURT: Okay. You’re basically saying, well, child, your mother’s going to get hers. Because it’s going to come back around to her. All right. Then it goes on and it says, “God gives the revenge and he can deal.”
 

 A. Uh-huh.
 

 THE COURT: Now, who’s going to God [sic] give revenge to? Who is God going to take revenge on?
 

 A. Well, we don’t — we don’t take revenge, God does—
 

 THE COURT: Well, who is God going to take that revenge out on that you’re writing your granddaughter about?
 

 A. Well, who had — I—I can’t say that, sir.
 

 THE COURT: Well, is it her mother? Is that who God is going to take revenge on?
 

 A. If — if she — if she’s deserving, it probably does mean that.
 

 [[Image here]]
 

 THE COURT: Okay. All right. So, you were talking about this child’s mother in this letter to her.
 

 A. Well, Donna has hurt us so much. And I — I do have kind of ill feelings
 
 *1242
 
 toward her. But I have to let God do the judging and revenging.
 

 THE COURT: Well, apparently you’re inviting your granddaughter to participate in—
 

 A. Oh, no. I didn’t mean to insinuate that.
 

 THE COURT: Well, that’s—
 

 A. No, sir.
 

 THE COURT: — that’s the way it reads.
 

 A. I did not mean that.
 

 [[Image here]]
 

 THE COURT: You’re not suggesting in this letter that this child’s mother had anything to do with your son having these charges filed against him, are you?
 

 A. No, sir.
 

 THE COURT: Because you refer to them as bogus, bogus charges.
 

 A. Yes, sir.
 

 THE COURT: But you’re not suggesting that his ex-wife had anything to do with that, are you?
 

 A. With the last charges?
 

 THE COURT: Yes, ma’am.
 

 A. The way that Tim was arrested, I think she had some — something to do with it, sir.
 

 ¶ 27. At the close of the case, the chancellor issued a ruling from the bench. The following summation, in pertinent part, explains the reasoning behind the chancellor’s decision to restrict Tim’s visitation:
 

 [Donna] has the primary physical custody of these children, and has had that custody since the inception of this case, and that will remain so.
 

 [[Image here]]
 

 It is extremely disturbing to the Court to read the handwriting of [Tim] as depicted ... [in Exhibit No. 2].
 

 He gets up here in court and admits that he wrote each and everyone of these documents enumerated one through seven. And what he sets forth in here is not worthy of the Court reading into the record. It is so disgusting that I’m not going to read any part of it in the record.
 

 [[Image here]]
 

 And he gets up here and he gives this story about being in Texas with Lola, the mother of this child.... [Lola] comes out to Texas in violation of her bond on a Greyhound bus, [and] spends three to five days with him. And he gives this story about getting drunk and taking Dramamine and her having a knife and prodding him into writing out all of these things and that he didn’t remember it.... Of course, he prefaced that testimony by saying that he didn’t drink much ..., that he didn’t know what he was doing.
 

 [[Image here]]
 

 And it may not be true what he wrote down, but he wrote it down. And for somebody to do something like that, there’s got to be a problem with you, [Tim], I don’t know what it is and I’m not up here to try to figure it out, but you’ve got problems, serious problems.
 

 [[Image here]]
 

 Now, on another matter that I see here, not only from your testimony in this hearing, but from the testimony from the prior hearings in this case, ... it’s my belief that [Tim] takes every opportunity that he can with these children to talk about their mother, talk their mother down, encourage them not to like their mother, encourage them to disrespect their mother.... He even got on this witness stand in earlier hearings and testified that, if something happened to him, he would want to see his children
 
 *1243
 
 raised by his parents rather than their own mother because she was stupid.
 

 [[Image here]]
 

 I’m going to leave the visitation just like it is until I find out what [the] [circuit [c]ourt is going to do. And even then, if they say ... you’re footloose and fancy free because of immunity ..., the only way the Court is going to consider unrestricted visitation with you is it’s going to have to be supervised, not at DHS, but by some other means until I’m satisfied you’ve got your act together.
 

 You claim to be a wonderful father and all of that, but to see what kind of mess you’ve got yourself into and what kind of situation you’ve put your children into ... losing your job. You can’t get a job. You can’t pay support. Well, I can understand why you’re in the kind of legal trouble you’re in and why your money goes somewhere else. But apparently you are getting help from your parents.
 

 And I’m also disturbed about the tone of this letter, Exhibit No. 7, that was sent to this child talking about God taking revenge on somebody. Something bad is going to happen. What goes around comes around. Her having the belief now, as she said from the witness stand today, that [Donna] over here had something to do with her son’s arrest by the Lamar County Sheriffs Department.
 

 Folks, y’all are going to have to get real. You’ve got to get in the real world. You’re in a heap of trouble.
 

 And ma’am, your son is in a heap of trouble. And you need to be worried about what’s going to happen in that regard. I’m going to wait and see what the circuit court does.
 

 ¶ 28. The record before this Court fully supports the chancellor’s findings, and we find no error with his decision to restrict Tim’s visitation to one day a week for one-and-a half hours at DHS. The chancellor properly took into consideration the children’s best interests in his decision, leaving open the possibility that Tim may be granted some form of unsupervised visitation with his children in the future.
 

 ¶29. Lastly, according to Tim, since the filing of this appeal, the State apparently has made a decision with regard to the criminal matter, which Tim submits weighs in his favor. This information must first be presented to the chancery court; we do not consider new evidence on appeal.
 
 Williams v. J.E. Walton & Son,
 
 202 Miss. 641, 648, 32 So.2d 566, 568 (1947).
 

 ¶ 30. This assignment of error is without merit.
 

 II. Alimony
 

 ¶ 31. Tim argues that the chancellor failed to include a proper analysis of the factors set forth in
 
 Armstrong v. Armstrong,
 
 618 So.2d 1278 (Miss.1993), in the findings-of-facts and conclusions-of-law portion of his final judgment. Tim submits that this was manifest error because he is unable to determine how the chancellor arrived at an alimony award of $100 per month.
 

 ¶ 32. We disagree. In
 
 Roberson v. Robersan,
 
 949 So.2d 866, 868-69 (¶ 6) (Miss. Ct.App.2007), this Court explained as follows:
 

 When considering an award of alimony, the chancellor is to consider the following factors: income and expenses of the parties; health and earning capacities of the parties; needs of each party; obligations and assets of each party; length of the marriage; presence or absence of minor children in the home; age of the parties; standard of living of the parties during the marriage and at support determination; tax consequences of the
 
 *1244
 
 spousal support order; fault or misconduct; wasteful dissipation of assets by either party; and any other equitable factors.
 
 Holley v. Holley,
 
 892 So.2d 183, 185 (¶ 6) (Miss.2004)( [citation omitted]). When an award of alimony is appealed, we presume the chancellor considered all factors in making his decision.
 
 Holcombe v. Holcombe,
 
 813 So.2d 700, 704 (¶ 12) (Miss.2002). When the chancellor fails to address all factors on-the-record, we are not required to remand the case, and should not, so long as all facts are available to us so as to allow an equitable determination to be made.
 
 Id.
 
 Thus, a lack of an on-the-record consideration of the
 
 Armstrong
 
 factors by a chancellor in making his determination of the appropriateness of an alimony award will only be reversed if, after a review of all facts and application of the
 
 Armstrong
 
 factors, it appears that the chancellor’s failure to make findings of fact and corresponding conclusions of law constitutes manifest error.
 
 See Godwin v. Godwin,
 
 758 So.2d 384, 387 (¶ 11) (Miss. 1999) (quoting
 
 Selman v. Selman,
 
 722 So.2d 547, 554 (¶30) (Miss.1998));
 
 see also Thompson v. Thompson,
 
 816 So.2d 417, 420 (¶ 9) (Miss.Ct.App.2002).
 

 ¶ 33. As Donna points out, during the trial on the merits, she and Tim stipulated to a division of marital property thereby precluding the chancery court from having to make a determination of the status and value of property and precluding the court from having to divide equitably such property pursuant to
 
 Ferguson v. Ferguson,
 
 639 So.2d 921 (Miss.1994). Still, there was evidence presented which gave the chancellor sufficient available information necessary to perform an evaluation of the
 
 Armstrong
 
 factors.
 

 ¶ 34. According to the record, the family had a reasonably comfortable middle-class standard of living during the course of the fifteen-year marriage, with Tim making upwards of $87,000 per year as an industrial engineer. The parties bought a house, and Donna was able to be a stay-at-home mother. Both parties were in good health — Tim, in his early forties, and Donna, in her mid-thirties. Tim has a bachelor of science degree in mechanical engineering and technology, with two years of graduate-school studies. Donna has three years of college experience, with no degree. As he reiterated throughout the case, Tim has much more earning capacity than Donna, who has been struggling to pay bills and to feed their three children. Donna now works as an administrative assistant and makes approximately $1,400 per month. The record reflects that both parties have significant debts, with no significant assets. As the chancellor noted, Donna has had to depend on assistance from her church to make ends meet. She also has had to obtain loans to pay her bills and attorney’s fees. Through no one’s fault but his own, Tim was terminated from BJ Services, and he is now working as a truck driver, with a net monthly pay of $1,000 per month. Tim says that he is working on securing a higher-paying job. Since being ordered to pay $359 per month in child support, the chancellor has granted Tim a downward adjustment in his support obligations. Tim is currently having to pay only $243 per month in child support, and Donna continues to struggle. Accordingly, we find that there was no abuse of discretion in the chancellor’s decision to award Donna $100 per month in permanent periodic alimony. This issue is without merit.
 

 III. Contempt
 

 ¶ 35. “Contempt matters are committed to the sound discretion of the trial court, and this Court will not reverse where the chancellor’s findings are supported by substantial credible evidence.”
 
 *1245
 

 Weston v. Mounts,
 
 789 So.2d 822, 826 (¶ 17) (Miss.Ct.App.2001) (citing
 
 Caldwell v. Caldwell,
 
 579 So.2d 543, 545 (Miss. 1991)). “A citation for contempt is proper only when the contemner has willfully and deliberately ignored the order or the court.”
 
 Bredemeier v. Jackson,
 
 689 So.2d 770, 777 (Miss.1997).
 

 ¶ 36. Tim makes a number of assertions in his brief that Donna interfered with his visitation rights. But, the only evidence contained in the record corroborating Tim’s claims is his testimony, which the chancellor found to be less than credible. In each of Tim’s contempt claims, the chancellor determined that Donna had not deliberately ignored the court’s order. The record supports the chancellor’s findings. Accordingly, this point of error is without merit.
 

 IV. Attorney’s Fees
 

 ¶ 37. Tim argues that the chancellor erred in awarding Donna, $22,297 ($4,438 + $17,859) in attorney’s fees. He contends that he was not given sufficient time to examine the itemized-fees statement submitted by her attorney, which was not submitted until prior to the third day of trial. Thus, he had inadequate time in which to prepare for cross-examination of Donna’s attorney. Tim further contends that the evidence submitted reflects that Donna has already paid $12,202, which clearly illustrates her ability to pay.
 

 ¶ 38. In divorce matters, the decision whether to award attorney’s fees is generally entrusted to the sound discretion of the chancellor.
 
 Tynes v. Tynes,
 
 860 So.2d 325, 331 (¶22) (Miss.Ct.App. 2003). Unless the chancellor abuses his or her discretion, the decision will generally be upheld.
 
 Ladner v. Ladner,
 
 436 So.2d 1366, 1375 (Miss.1983). Factors to be considered in an award of attorney’s fees include the relative financial ability of the parties; the skill and standing of the attorney employed; the nature of the case and novelty and difficulty of the questions at issue; the degree of responsibility involved in the management of the cause; the time and labor required; the usual customary charge in the community; and, the preclusion of other employment by the attorney due to the acceptance of the case.
 
 McKee v. McKee,
 
 418 So.2d 764, 767 (Miss.1982).
 

 ¶ 39. According to the record, counsel for both parties discussed an order for attorney’s fees at the conclusion of the hearing held on March 4, 2008. The court offered Tim’s counsel additional time to review the itemized-fees statement submitted by Donna’s counsel; however, Tim’s counsel said it would not be necessary because he had already reviewed it, and he offered no objection.
 

 ¶ 40. This case has spanned more than four years. Even though the divorce claim itself was resolved in short order, the custody matter was both lengthy and trying. The amount charged per hour was standard, and the time put in was justified. While Tim currently claims to be in “dire financial straights,” he has nonetheless found the means necessary to force Donna into court to defend herself against a number of meritless contempt motions. And although Donna has already paid more than half of the fees, she has had to borrow the funds to do so. Accordingly, we find no abuse of discretion in the chancellor’s decision to award Donna attorney’s fees in the amount so ordered. This issue is without merit.
 

 ¶ 41. THE JUDGMENT OF THE JONES COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 
 *1246
 
 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Donna is also a Navy reservist.
 

 [2]
 

 .
 
 See Albright v. Albright,
 
 437 So.2d 1003, 1005 (Miss. 1983) (outlining the relevant factors to be considered in child-custody considerations).
 

 [3]
 

 . According to the record, Lola has since pleaded guilty to child molestation and is serving a twelve-year sentence in the custody of the Mississippi Department of Corrections.
 

 [4]
 

 .
 
 But see,
 
 e.g.,
 
 Wallace v. Jones,
 
 572 So.2d 371, 377-78 (Miss.1990) ("[MJembers of the bar should be warned that when you allow your client to testify on material matters involved in a case[,] ... opposing counsel has a right or even a duty to cross-examine the witness.”).