IRVING, J.,
for the Court.
¶ 1. James Terry Dykes and Shelia Dykes, now Shelia Dykes McMurry, were granted a divorce on the ground of irreconcilable differences. Pursuant to the parties’ court-approved agreement, Shelia was granted custody of the couple’s three chil *332 dren. Thereafter, James requested a modification of the custody order to change the primary physical custody of his sons to him rather than Shelia. James also filed a complaint requesting that the Perry County Chancery Court grant him relief from his child support obligations to his oldest son, Kee. After a trial, the court declined to alter the custody arrangement or alter James’ child support obligations to Kee. Aggrieved, James appeals and asserts that the court erred in requiring him to continue paying child support for Kee and in refusing to alter the custody order so as to award custody to him.
¶ 2. Finding no error, we affirm.
FACTS
¶ 3. James and Shelia were married for nearly twenty years before their divorce on May 5, 2003. After their divorce, Shelia was granted primary physical custody of Kee, born September 4, 1987, Taler, born October 26, 1992, and Hunter, born November 22, 1999. Shortly after the divorce, Shelia remarried, and James remarried his current wife some time after Shelia’s remarriage. On June 2, 2004, James filed a petition requesting modification of the custody order and seeking custody of his three children. The petition alleged that the children were “abused mental [sic] and verbally.” On October 26, 2004, James filed a petition requesting that the court terminate James’ child support obligations to Kee, on the grounds that Kee refused to pursue a relationship with him.
¶ 4. The court ordered a custody evaluation by Deslie Bonano, a licensed clinical social worker. Bonano found that it would be in Taler and Hunter’s best interests for their custody to be placed with James. However, Bonano testified that she did not realize that the legal standard pertaining to custody modification determinations is different from the standard in initial custody determinations. Therefore, Bonano’s evaluation only addressed which parent would have been more fit for initial custody placement and did not specifically address what material change had occurred in order to warrant a modification of the custody order.
¶ 5. After hearing all the evidence, the court found that custody should be left with Shelia. The court noted that all the children did well in school and were reported to be well-adjusted. The court acknowledged Taler’s stated desire to live with his father, but found that nothing Taler said indicated that he suffered “any treatment that is detrimental to him” at his mother’s house. The court found that “[e]ach parent is found to have put pressure on Taler in their own way of communicating with him.” The court further noted that Taler appeared to “fit in well with the extended families of both parents.” The court noted that “the law of this jurisdiction requires more than occasional unhappiness in a child to justify a contested change of custody” and determined that there had been no material change in circumstances sufficient to justify an alteration of the custody order. Although the court declined to grant James custody of the children, the court did alter the custody arrangement to give James a longer period of visitation during the summer break.[1]
¶ 6. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
*333 ANALYSIS AND DISCUSSION OF THE ISSUES

Standard ofRevieiv

¶ 7. We apply a limited standard of review to a chancellor’s determination in custody cases. Dep’t of Human Servs. v. Marshall, 859 So.2d 387, 389(¶ 3) (Miss.2003) (citing Miss. Dep’t of Human Servs. v. Shelby, 802 So.2d 89, 92(¶ 11) (Miss.2001)). We will not reverse the chancellor’s findings “unless the court was manifestly wrong, abused its discretion or applied an erroneous legal standard.” Id. (citing Sandlin v. Sandlin, 699 So.2d 1198, 1203 (Miss.1997)).

1. Child Support for Kee

¶ 8. The seminal Mississippi case addressing situations in which child support may be terminated due to deterioration of the parent-child relationship is Caldwell v. Caldwell, 579 So.2d 543 (Miss.1991). In Caldwell, a father argued that his son had “abandoned the father-son relationship,” thus releasing the father from his obligation to pay child support for the son. Id. at 548. The father in Caldwell based his argument on eases involving payment of a child’s college expenses, but the Mississippi Supreme Court pointed out that “paying for the extra expense of a child’s college education is much different from paying for a child’s support.” Id. (citing Nichols v. Tedder, 547 So.2d 766, 769 (Miss.1989)). The court found that, in order for a child to reject the parent-child relationship to the point where child support is forfeited, the child’s actions would have to be both “clear and extreme.” Id. The court explained: “The amount of money that the noncustodial parent is required to pay for the support of his minor children should not be determined by the amount of love the children show toward that parent.” Id. (quoting Holston v. Holston, 58 Md.App. 308, 473 A.2d 459, 463 (Md.Ct.Spec.App.1984)).
¶ 9. In Marshall, the Mississippi Supreme Court found that a child’s actions did not rise to the level necessary to terminate child support obligations where the child refused to speak to the father during their second meeting and said that he wanted to go home. Marshall, 859 So.2d at 390(¶ 8). The court noted: “One bad visit between a son that has seen his father twice after many years apart does not rise to the level of clear and extreme conduct envisioned by Caldwell. It is only reasonable that [the child] would harbor some resentment against his father.” Id.
¶ 10. This Court found conduct sufficient to terminate child support obligations in Roberts v. Brown, 805 So.2d 649 (Miss.Ct.App.2002). In Roberts, a daughter accused her father of raping her, but the father was acquitted after a criminal trial on the matter. Id. at 650-51 (¶¶ 3-4, ¶ 9). The daughter also refused to visit her father. Id. at 650(¶ 2). We found that the daughter’s accusation of rape constituted “clear and extreme” actions, sufficient to terminate the father’s child support obligations. Id. at 653(¶ 19).
¶ 11. In the case before us, we find that Kee’s actions are not clear and extreme. When asked why he had stopped visiting his father, Kee testified that he stopped visiting his father because he was hurt by the lawsuit against his mother and by his father’s petition to terminate child support. Kee specifically testified that he still loved his father but does “not want anything to do with him.” Kee testified that the relationship between him and his father “is finished.” Kee testified that his father does not come to any of his games or school functions. Kee further testified that his father had not called his house to speak to him or made any special effort to sit down and talk with him. Kee specifi *334 cally testified that he was hurt by his father’s allegations in his petition that he and his brothers had been verbally abused and needed counseling. Kee indicated that his father’s complaint that Kee never calls his father is one-sided: “he could have called me too.”
¶ 12. James testified that he would be willing to resume negotiations with Kee and attempt to have a relationship with him. In its judgment, the court found:
While Plaintiff says he wants custody of all three children and wants a better relationship with Kee, he requests that his support obligation be terminated as to Kee because of the unpleasantness between them.... The Court finds that position to be somewhat contradictory, and an oversimplification of dealing with the relationship between a father and his son.
The court then declined to grant James relief from his child support obligations to Kee.
¶ 13. Although the court provided little in the way of reasoning for its decision, we find that the court was not manifestly wrong, did not abuse its discretion, and did not apply an erroneous legal standard in finding that James’ child support obligations should not be terminated. Kee testified that he still loves his father. It is conceivable that the relationship between Kee and James can be repaired. While James indicated that he has done everything to get in touch with Kee other than waylaying Kee’s car, evidence at trial indicated otherwise. There was no indication that James has made any effort to attend any of Kee’s school and sports functions. Testimony indicated that James never called Kee’s house to ask to speak to him.
¶ 14. Given the circumstances surrounding Kee and James’ relationship, specifically the custody action filed by James against Shelia alleging that she abuses her children, we do not find that Kee’s current unhappiness with his father indicates a “clear and extreme” rejection of the father-son relationship. Kee indicated that he was hurt by the legal action against his mother, and the allegations of abuse contained therein, and was further hurt by his father’s petition to terminate child support. Kee did not testify that he hates his father; in fact, he testified that he still loves his father. While Kee has indicated that he wants nothing more to do with his father, his affirmation of love for his father indicates that his rejection of the father-son relationship is not entirely clear. Furthermore, given the petition filed by James and the allegations contained therein, namely that Kee’s mother abused Kee and his siblings, Kee’s current unhappiness with his father is not “extreme.” Therefore, the court did not err in declining to terminate the child support owed by James to Kee.

2. Custody

¶ 15. In order to successfully petition for a modification of an existing custody order, a party must show that there has been “a material change in circumstances which adversely affects the welfare of the child” and that “the best interest of the child requires the change of custody.” Brocato v. Brocato, 731 So.2d 1138, 1141(¶ 9) (Miss.1999) (quoting Smith v. Jones, 654 So.2d 480, 486 (Miss.1995)). When determining the above, a court should look at “the ‘totality of the circumstances.’ ” Id. (quoting Ash v. Ash, 622 So.2d 1264, 1266 (Miss.1993)). The moving party has the burden of proving that a material change has occurred. Id. (citations omitted). Although a party must show that there has been a material change in circumstances to justify a custody modification, the best interest of the child is our “polestar consideration.” Cri *335 der v. Crider, 904 So.2d 142, 144(¶ 6) (Miss.2005) (quoting Riley v. Doerner, 677 So.2d 740, 744 (Miss.1996)).
¶ 16. We note that Taler testified that, although he would prefer to live with his father, he had never been threatened “or anything of that nature” at his mother’s house. No other evidence indicated that Taler had ever been threatened or verbally abused. Taler himself testified that he did not feel that his mother was attempting to limit his time with his father. When asked why he would prefer to live with his father, Taler pointed out that he would have a room of his own if he lived with his father. However, Taler later testified that he did not mind sharing a bedroom with Hunter, which is the arrangement at his mother’s house. Taler testified that his mother attends all of his school functions, but that his father does not. Taler also testified that his mother had told him that she would love him, even if he chose to live with his dad. Taler testified that he has no reason to say he is unhappy, testified that no one has mistreated him, and testified that he gets along well with his stepbrothers and stepsisters. Taler further testified that he gets to do “fun activities” at his mother’s house, such as fishing, hunting, and playing baseball.
¶ 17. Diane Dykes, James’ current wife, testified that she loves James’ children. She also testified that the children are unkept and appear “thrown away” when they come to visit their father from their mother’s house. James himself, however, testified: “Taler again has said from the time that [Shelia] left me that he wanted to live with me. He’s had to live in — I will not say bad situations. I do not say that. I never said that Sheila was a bad mama to him.” James also testified that “Joey [Shelia’s husband] as far as I know has never been mean to [Taler].” Taler’s teacher, Barbara Oberst, testified that Taler appears happy and well-rounded. She also testified that Taler and his siblings always appear to be well-groomed and appropriately dressed.
¶ 18. Shelia testified that, since she married Joey, Taler’s grades have not dropped at school, and no discipline problems have been reported to her. Shelia also testified that the only times Taler tells her that he wants to live with his dad is when he gets in trouble or is disciplined.
¶ 19. James relies heavily on the custody evaluation completed by Bonano. However, Bonano testified that she was not aware of the test for custody modification. Therefore, Bonano addressed only what would be in the best interest of Taler, as though she were conducting an evaluation for an initial custody determination. Bo-nano also testified that Shelia’s home was “appropriate as far as living arrangements for the kids.” She noted that Shelia’s home, as well as James’, was “clean and neat.” Bonano testified that Shelia’s new marriage was a change for Taler and Hunter in the sense that they “no longer slept with their mom” and “[t]hat was very difficult for them to do.” Bonano testified that she thought Taler exhibited signs of anxiety. Bonano testified that she had had Taler draw pictures for her of both his families. In the picture of his mother’s family, none of the figures were given hair or eyes, while James’ family had hair and eyes. Bonano interpreted this to mean that “he [Taler] does not have an identity there [at Shelia’s house].” However, Bo-nano then went on to testify that “[t]hat is a laymen’s [sic] opinion,” although she then testified that that opinion was based on picture interpretation that she had learned in a graduate school class. Bona-no concluded from her evaluation that Taler would get “some relief’ if he went to live with his father. Bonano testified that she is concerned because she believes that *336 Shelia is more concerned with “having the image with the public that the family remain as a whole” than with addressing why Taler has stated that he would prefer to live with his father.
¶ 20. During cross-examination, Bonano admitted that Taler’s anxiety could be caused by him “having to choose one parent against the other.” When Bonano testified that he appeared calm around his father, Shelia’s attorney got her to acknowledge that that could be in part because anxiety would stem from having to face Shelia and tell her that he did not want to live with her, whereas no such anxiety would be caused by relating with his father. Despite recommending that Taler live with his father, when asked which parent appeared “to have the greatest opportunity to attend to [Taler’s] needs on a daily basis,” Bonano responded that Shelia was best suited to providing for Taler’s daily needs.
¶21. In making its ruling, the court acknowledged Bonano’s findings that Taler’s behavior indicates that he is “symptomatic” of depression and anxiety, but also noted that Bonano “did not recommend future counseling at this time.” The court found that Taler’s current discomfort at his mother’s house does not constitute a material change in circumstances sufficient to justify a change in custody: “the law of this jurisdiction requires more than occasional unhappiness in a child to justify a contested change of custody.”
¶ 22. After reviewing the record, we cannot say that the court in this case abused its discretion in refusing to modify the custody order. The Mississippi Supreme Court has held: “This Court has long held that remarriage itself does not constitute a material change in circumstances that would justify a change of custody.” Robison v. Lanford, 841 So.2d 1119, 1123(¶ 14) (Miss.2003) (citing Allen v. Allen, 243 Miss. 23, 33, 136 So.2d 627, 632 (1962)). We see little change in circumstances in the present case other than Shelia’s remarriage to her current husband. Specifically, the evidence presented clearly showed that Taler has suffered no abuse at his mother’s house. Taler himself testified that he has never felt threatened at his mother’s house. Evidence indicated that Taler has enjoyed himself while on trips with Shelia and her new husband, and is healthy and well-adjusted in his mother’s home. Shelia’s testimony indicated that Taler only complained of wanting to live with his father when he got in trouble. James, as the moving party, failed to show that there has been a material change in circumstances adverse to his children’s well-being sufficient to warrant a change in custody.
¶ 23. Furthermore, while testimony indicated that Taler would prefer to live with his father,[2] it is not clear from the record that such a placement is in Taler’s best interests. Although Bonano testified that she believed the change in custody would be in Taler’s best interests, she also testified that Shelia was better suited to providing for Taler’s daily needs than James. In short, there was conflicting evidence as to which placement would be in Taler’s best interests. The court reasonably could have found that either placement was in Taler’s best interests, and did not err in finding that remaining in Shelia’s custody was in Taler’s best interests. The court specifically found that “both parents love their children and desire to be with them in a custodial capacity.”
¶ 24. James also contends that the court erred in not making an on-the-record *337 finding as to why Taler’s preference to live with his father was not in Taler’s best interests, and James cites Polk v. Polk, 589 So.2d 128, 130 (Miss.1991), as support. However, a child’s suggestion of preference, without supporting evidence that there has been a material change in circumstances adverse to the child’s best interests, is not sufficient to justify a modification of a custody order. Best v. Hinton, 838 So.2d 306, 308-09 (¶¶ 6-11) (Miss.Ct.App.2002). Regardless of a child’s preference, we have held that, in order to modify a custody order, a party must show “that the custodial situation ... ha[s] so deteriorated since the earlier adjudication as to adversely affect the child’s welfare.... ” Id. at 309(¶ 11).
¶ 25. Since no material change in circumstances was proven, the court did not err in refusing to modify the custody order. Mississippi law requires a material change in circumstances before alteration should be made to a custody determination. Furthermore, although courts should still consider strongly what is in the best interests of a child, the evidence in the present case is not unequivocal that placement with James would be in his children’s best interests. The court did not err in declining to grant James custody of his children.
¶ 26. THE JUDGMENT OF THE CHANCERY COURT OF PERRY COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.

. Prior to the court's order, James had custody for only two weeks during the summer. The modification order gave James custody "from the weekend when school is out until the weekend before school begins the next semester, providing however, that [Shelia] shall have the children with her every other weekend and two weeks in July during the summer vacation period.”

. We do not address Hunter’s preferences, because he is too young to express a preference as to which parent he would prefer to live with.