# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01008-COA

**GENEVA C. IVORY** APPELLANT

v.

**KEITH M. AUBERT** APPELLEE

DATE OF JUDGMENT: 12/05/2017
TRIAL JUDGE: HON. SANFORD R. STECKLER
COURT FROM WHICH APPEALED: HARRISON COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT: PATRICK TAYLOR GUILD
HOLLIS TAYLOR HOLLEMAN
ATTORNEY FOR APPELLEE: CHRISTOPHER G. HOLT
NATURE OF THE CASE: CIVIL - DOMESTIC RELATIONS
DISPOSITION: REVERSED, RENDERED IN PART, AND REMANDED IN PART - 06/09/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., WESTBROOKS AND C. WILSON, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1. Keith Aubert filed a motion for contempt and modification of child support obligations, or, in the alternative, voluntary dismissal of parental rights. The trial court terminated Aubert's child support obligations and made the ruling effective retroactively. Geneva Ivory appealed. Finding the trial court erred in terminating Aubert's child support obligations, we reverse, render in part, and remand in part.

## FACTS AND PROCEDURAL HISTORY

¶2. On January 3, 2006, the trial court entered an "Agreed Order" establishing Keith M.

Aubert as the father of G.A.,[1] the then five-year-old minor child of the parties who was born in September 2000. The Agreed Order awarded sole physical custody to the mother, Geneva Ivory. Aubert was awarded visitation with G.A., provided that he pay monthly child support and maintain health insurance, with all medical costs not covered by the insurance to be equally divided between the parties. According to the record, Aubert lived in Virginia with his current family. The record reflects that Aubert only saw his daughter twice after the 2006 Agreed Order regarding paternity, custody, support, and visitation and until this litigation began in 2015.[2] On May 19, 2015, Aubert filed a "Motion for Modification and Contempt of Agreed Judgment." After several responsive pleadings were exchanged, a hearing was held on August 17, 2015. After the hearing, an agreement was reached between the parties, which was reduced to writing in an Agreed Order entered on October 16, 2015.

¶3.     The 2015 Agreed Order increased Aubert's monthly child support obligation from $415.00 per month to $952.00 per month and added an additional monthly obligation of $103.50 to cover the cost of health insurance. Aubert was also required to pay all costs associated with visitation with his daughter. Additionally, the 2015 Agreed Order addressed visitation. First, the order noted that at the time of entry, the minor child was then fifteen years old "and had no meaningful relationship with her father." This was based upon the fact that Aubert had only seen his daughter twice since the original order from 2006. The 2015

---

[1] We use initials to protect identities in this case.

[2] According to the testimony of Aubert, Ivory, and G.A., the last time G.A. saw her father was when she was nine years old and she got separated from him at a Mardi Gras parade.

Agreed Order "granted the minor child wide discretion regarding her visitation with her father." This was due in larger part, as noted by the trial court, to "the age of the minor child at the time and the lack of visitation in the past 11 years." That being said, the parties agreed and stipulated that visitation would not interfere with her school and extra-curricular activities at home in Mississippi. The 2015 Agreed Order further stated that "the discretion granted the minor child did not relieve the mother of her duty to parent, direct and be diligent in fostering and encouraging the child to have a relationship with her father."

¶4. On May 10, 2016, Aubert filed the document that eventually triggered this appeal. Aubert had attempted to see G.A., but she was unavailable the day he requested, advising she was free the following day. Aubert responded via text that if he could not see her on his own time, he would not see her at all. The subsequent motion Aubert filed was the motion for contempt and modification of child support obligations or, in the alternative, voluntary dismissal of parental rights. Ivory filed a motion to dismiss or, in the alternative, for a continuance.

¶5. After a hearing on November 29, 2016, the court entered an order dismissing Aubert's request to terminate his parental rights, dismissing the motion for modification of child support obligations, set the motion for contempt for trial, determined that all future child support payments were conditional pending the outcome of trial, determined that all future child support payments should be paid into the registry of the court to await the outcome of trial (when they would either be returned to Aubert or given to G.A.), and granted the continuance so the trial regarding the alleged contempt would not interfere with G.A.'s

3

school work.  The trial was held on July 17, 2017.

¶6.     The chancellor went against his own order from November 29, 2016, in choosing to address child support obligations. The chancellor's order states that "[a]dditionally, as the stipulated agreement left the decision regarding whether, when and in what form, visitation would take place primarily to the minor child, the court cannot find Ivory in contempt." The order further states that "the proof presented on the contempt issue fell short of the standard required." The court found Ivory was not in contempt. Without a finding of contempt by the chancellor, nothing remained for the chancellor to address, including child support obligations. However, according to the record, Ivory made no objection during the proceedings. Although the chancellor found Ivory's conduct did not support a finding of contempt, he next addressed child support obligations.

¶7.     With regard to the whether the child support obligation should stop, the court cited *Caldwell v. Caldwell*, 579 So. 2d 543 (Miss. 1991), as its guiding authority. The court summarized the standard it used by stating that "the court must therefore determine whether the actions of the child in this case have been 'both clear and extreme' to the point that [Aubert]'s child support obligation should end." The court gave great weight to Aubert's testimony that he had reached out to his teenage daughter numerous times since the 2015 agreed order but to no avail. The court similarly gave weight to G.A.'s own testimony that she did not respond to or talk to her father when he called and texted, with few exceptions. The court also found that Ivory made little attempt to encourage her daughter's relationship with her father. As the court pointed out, "the minor child even testified that she wished to

4

have no relationship with her father." Ultimately, the court held that "the minor child's complete exclusion of her father from her life does indeed constitute a clear and extreme antithesis towards her father." The court stated that "based upon the evidence presented and as a direct result of the actions of the minor child, the court finds it appropriate to terminate [Aubert's] child support obligation."

¶8.    The court next had to address the issue of when the support obligations would end. Ivory correctly argued that a reduction or termination of child support may not be made retroactively. The court agreed with Ivory but interpreted its own actions differently than Ivory. Specifically, the court held, "However, the court finds the arguments of [Ivory] to be misplaced and completely ignores the purpose of placing the funds in to the registry of the court in the first place." The court further found that its November 29, 2016 order made Aubert's mandatory obligations to pay child support "conditional upon his having visitation with his child." Further the court stated that "having now decided that [Aubert's] child support obligation should terminate, the court finds that the termination of that obligation ended on November 29, 2016." The court further placed all responsibility for the failure of visitation on the minor child by holding that failure to have visitation rests with G.A. and Ivory and "not with [Aubert], as he went to great lengths to re-establish a viable relationship with his child." The court then returned the funds previously paid into the court to Aubert. In the end, the court found that due to G.A.'s behavior, child support obligations of any kind ended, and they ended (retroactively) effective November 29, 2016. Aubert was refunded the monies paid into the court since November 2016, totaling $11,424.00. Aggrieved, Ivory

5

appealed.

## STANDARD OF REVIEW

¶9. "This Court will not disturb the findings of a chancellor in domestic relations matters unless the chancellor's decision was manifestly wrong, clearly erroneous, or applied an erroneous legal standard." *Lewis v. Pagel*, 172 So. 3d 162, 172 (¶16) (Miss. 2015). "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Gutierrez v. Gutierrez*, 153 So. 3d 703, 707 (¶9) (Miss. 2014). We review questions of law de novo. *Id*.

## DISCUSSION

¶10. While Ivory enumerates multiple issues in her brief, her issues can be efficiently condensed into one dispositive issue: whether the chancellor erred in terminating all child support obligations.[3] The chancellor's decision to terminate Aubert's child support obligations controls any other potential points of error raised by Ivory because if the chancellor's decision was incorrect, then Aubert's child support obligations would naturally resume, consistent with the terms set forth in the controlling order from October 16, 2015.[4]

¶11. Regarding child support obligations, Aubert argued, and the chancellor agreed, that

---

[3] At the conclusion of the contempt trial, Ivory made no objection regarding the proceedings or the court's handling of them. But in her brief, Ivory argues the issue of whether child support obligations should have continued was not properly before the trial court.

[4] We address the issue of child support obligations because Aubert pursued it at trial, Ivory did not object to it, and the chancellor ruled on whether or not child support obligations should continue.

6

G.A. had totally abandoned the father-daughter relationship and so disliked her father that he should no longer have to pay any support for G.A. The chancellor correctly noted in his order that Mississippi has adopted a specific standard regarding such questions, yet he incorrectly applied the authority he cited. The chancellor's order outlines the applicable analysis as follows:

> The Mississippi Supreme Court has articulated two (2) standards for the trial court to utilize in determining whether termination of child support is warranted based upon the age of the child. The first standard, found in *Caldwell v. Caldwell*, 579 So. 2d 543 (Miss. 1991) applies when the child is not of college age: "In order for the child to reject the parent child relationship to the point where the child support is forfeited, the child's actions . . . have to be both clear and extreme." The second standard, found in *Hambrick v. Prestwood*, 382 So. 2d 474 (Miss. 1980), is when the child is of college age: A parent's duty to support a child in college "is dependent, not only on the child's aptitude and qualifications for college, but on whether the child's behavior toward, and relationship with the father, makes the child worthy of the additional effort and financial burden that will be placed on him." *Strasny* at 198 quoting *Hambrick* at 477. [sic]

The chancellor correctly determined that because G.A. was of high-school age at the time of this litigation and not of college age, the *Caldwell* analysis should control as stated in the order:

> In the case at bar, the minor child in question is not of college age, therefore the *Caldwell* standard applies. The court must therefore determine whether the actions of the child in this case have been "both 'clear and extreme'" to the point that Keith's child support obligation should end.

This Court agrees with the chancellor that because the minor child is not of college age, the *Caldwell* standard and analysis applies to this case. However, the chancellor incorrectly applied the law to the facts in this particular case.

¶12.   Our Supreme Court in *Caldwell* stated:

7

> The amount of money that the noncustodial parent is required to pay for the support of his minor children should not be determined by the amount of love the children show toward that parent. The proper inquiry, as we have often stated, is what is in the best interest of the child. In reaching that conclusion, the chancellor must balance the needs of the child against the parent's financial ability to meet those needs.

*Caldwell*, 579 So. 2d at 548. Further, our Supreme Court outlined the standard for such inquiries as follows: "It is not suggested that there could never be a situation where a minor child as young as fifteen might by his actions forfeit his support from a non-custodial parent. Those actions would have to be clear and extreme, and they are not present in the case at bar." *Id*. In *Caldwell*, like G.A. in the present case, the minor child was in high school and had little to no relationship with the father, and was not excited about forming a relationship. The Supreme Court found no evidence of "clear and extreme" behavior on the part of the minor child towards the father to warrant termination of all support obligations. Specifically, the court found that evidence of the minor child's dislike and even admitted hostility towards his father was not enough. The court noted that like Aubert in the present case, the father "voluntarily moved to Florida, which makes regular visitation more difficult." *Id*. at 550. The court also noted that, like G.A. in the present case, "Matt testified that he disliked his father; some bitterness should be expected when a father files suit to sell his son's home out from under him, and attempts in the same proceeding to end all support for him." *Id*.

¶13. Mississippi courts have been clear and unambiguous regarding the issue of termination of child support obligations due to the deterioration of the parent-child relationship. "The seminal Mississippi case addressing situations in which child support may be terminated due to deterioration of the parent-child relationship is *Caldwell v. Caldwell*,

8

579 So. 2d 543 (Miss. 1991)." *Dykes v. McMurry*, 938 So. 2d 330, 333 (¶8) (Miss. Ct. App. 2006). In *Dykes*, this Court pointed out that the father in *Caldwell* erroneously based his argument on cases involving payment of college expenses and placed emphasis on what the Supreme Court actually said which was that "paying for the extra expense of a child's college education is much different from paying for a child's support." *Id*. Further, this Court unambiguously reiterated the standard set forth in *Caldwell* by stating that "in order for a child to reject the parent-child relationship to the point where child support is forfeited, the child's actions would have to be both 'clear and extreme.'" *Id*. (quoting *Caldwell*, 579 So. 2d at 548). This Court further agreed with the principle set forth in *Caldwell* that said the amount of money the non-custodial parent pays in support has nothing to do with the amount of love the child shows the parent. *Id*.

¶14.     This Court in *Dykes* further walks us through binding Mississippi precedent in their discussion of *Department of Human Services v. Marshall*, 859 So. 2d 387 (Miss. 2003):

> In *Marshall*, the Mississippi Supreme Court found that a child's actions did not rise to the level necessary to terminate child support obligations where the child refused to speak to the father during their second meeting and said that he wanted to go home. The court noted: 'One bad visit between a son that has seen his father twice after many years apart does not rise to the level of clear and extreme conduct envisioned by *Caldwell*. It is only reasonable that [the child] would harbor some resentment against his father.'

*Dykes*, 938 So. 2d at 333 (¶9) (quoting *Marshall*, 859 So. 2d at 390 (¶8)). In *Dykes*, this Court applied binding Mississippi precedent and determined that the actions of the teenager towards his father were not clear and extreme. This Court stated that

> [w]hen asked why he had stopped visiting his father, Kee testified that he stopped visiting his father because he was hurt by the lawsuit against his

9

> mother and by his father's petition to terminate child support. Kee specifically testified that he still loved his father but does not want anything to do with him. Kee testified that the relationship between him and his father is finished.

*Id*. at (¶11). This Court specifically held that "Kee's current unhappiness with his father is not 'extreme.' Therefore, the court did not err in declining to terminate the child support owed by James to Kee." *Id*. at 334 (¶14).

¶15.   Mississippi precedent states that child support obligations may be terminated due to the deterioration of the parent-child relationship only upon a showing that the child's action toward the non-custodial parent is both clear and extreme. Binding Mississippi precedent also makes it clear what is not "clear and extreme" conduct on the part of the minor child. *See Caldwell*, 579 So. 2d at 548; *Marshall*, 859 So. 2d at 390 (¶9) (holding that a teenager who was refusing to speak to or visit with his father after only seeing his father a few times in his entire life did not rise to the level of clear and extreme conduct); *Dykes*, 938 So. 2d at 334 (¶14) (showing where teenage son testified he loved his father but that their relationship was finished and he wanted nothing more to do with the non-custodial parent). What has been considered conduct so clear and extreme as to justify a termination of all support obligations is equally clearly defined by precedent. *See Roberts v. Brown*, 805 So. 2d 649, 654 (¶20) (Miss. Ct. App. 2002) (discussing a teenage daughter who accused the father of rape and refused to visit with him); *Stasny v. Wages*, 116 So. 3d 195, 198 (¶12) (Miss. Ct. App. 2013) (showing where a college-age daughter's request to be adopted by her stepfather was clear and extreme); *Copeland v. Copeland*, 235 So. 3d 91, 93 (¶3) (Miss. 2017) (Where children acknowledged sending emails and texts expressing desire to kill their father, the court said

10

such "vitriolic invectives, expressing deep-seated anger, resentment and ill-will" not just toward their father but also toward his family supported chancellor's finding of clear and extreme conduct.).

¶16.     In the case currently before this Court, there is no evidence or testimony in the record that demonstrates the "clear and extreme" conduct required to terminate Aubert's child support obligation. While G.A. may now be older, at the time this litigation began, G.A. was a young teenager. G.A. testified she did not hate her father. She testified she did not know what she wanted. She testified she was hopeful that one day things might be different. There have been no allegations of abuse. There have been no wishes of death. There have been no requests to be adopted by a stepfather. The chancellor's ruling terminating Aubert's child support obligations contradicted clear and binding precedent and was not supported by sufficient evidence.

¶17.     We therefore reverse the trial court's decision terminating Aubert's child support obligations and render that any and all vested child support payments made by Aubert into the registry of the court be paid to Ivory on behalf of G.A. Because we reverse the trial court's decision to terminate Aubert's child support obligations, and given the age of the minor,[5] we further render that Aubert continue making support obligation payments. Prior to this litigation, Aubert was paying child support obligations pursuant to an order from the chancellor. That order outlined the details of Aubert's child support obligations. The order detailing Aubert's child support obligations is not a part of this record. As such, we must

_____

[5] The minor was born in September 2000, and as such has not yet reached the age of majority.

remand this case back to chancery court for the chancellor to determine the following: beyond the money paid by Aubert into the registry of the court, what further support is owed by Aubert consistent with this opinion?

¶18. **REVERSED, RENDERED IN PART, AND REMANDED IN PART.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, McDONALD AND McCARTY, JJ., CONCUR. C. WILSON, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. J. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**