# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00006-COA

**BRITTANY L. KREPPNER**                                                          APPELLANT

**v.**

**WILLIAM D. KREPPNER**                                                          APPELLEE

DATE OF JUDGMENT:            02/20/2020
TRIAL JUDGE:                 HON. CARTER O. BISE
COURT FROM WHICH APPEALED:   STONE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:      WILLIAM W. DREHER JR.
ATTORNEY FOR APPELLEE:       HERBERT J. STELLY
NATURE OF THE CASE:          CIVIL - DOMESTIC RELATIONS
DISPOSITION:                 AFFIRMED - 03/22/2022
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE BARNES, C.J., McCARTY AND SMITH, JJ.

### McCARTY, J., FOR THE COURT:

¶1.     Just a few months after agreeing to a custody order that severely limited her visitation with her daughter, a mother sought modification of the terms. Finding she had not met her burden of proving a material change in circumstances, the chancery court denied the motion. As this decision was within the chancery court's discretion, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     For the past seven years since her parents' agreed custody order, nine-year-old Katie has lived almost exclusively with her father.[1] While William and Brittany Kreppner share

---

[1] We will refer to the parties' daughter by a pseudonym, as this Court may decline to identify minor children by name.

legal custody of their daughter, the father has what is in effect sole physical custody.

¶3.     The Kreppners' divorce was a contentious one, with both parties initially filing on fault-based grounds. But ultimately the couple was granted a divorce based on irreconcilable differences. The parents' agreed custody order provided William would have physical custody.

¶4.     Under the agreed terms, Brittany had extremely restricted visitation with her daughter, seeing her every other weekend. Notably, even this limited visitation was required to be supervised. And as the non-custodial parent, Brittany agreed to pay $200 per month in child support.

¶5.     Seven months after the divorce, Brittany petitioned the court for modification of custody. Many of Brittany's concerns were related to William's new wife, Bridget.[2] For instance, Brittany claimed that William allowed Katie's new stepmother "to interfere with such love and affection of the child for the Mother" and that Bridget "has shown nothing but scorn and hate" for Brittany. She further contended that William and Bridget "refuse[d] to allow the minor child any telephone contact" with her mother and are using Katie as "a pawn and an instrument to harm" Brittany.

¶6.     The mother's motion also included a request for the court to find her ex-husband in contempt. She provided a list of ways William refused to comply with his duties as custodial parent. For example, she alleged William "capriciously and arbitrarily refuse[d] to share in

---

[2] The final judgment of divorce was entered in early 2016, and both William and Brittany remarried that summer. William married Bridget, and Brittany married Stephen Eaton.

the decision-making rights, the responsibilities and the authority relating to the health, education and welfare" of their daughter. Brittany further claimed William does not allow her "to attend any appointment or function involving the minor child" or allow her to access Katie's school or medical records.

¶7. In concluding her motion, Brittany requested "paramount physical care[,] custody[,] and control of the minor child with the Father having visitation with certain restrictions." She claimed "there has been a material and substantial change in circumstances to the detriment of the minor child" that warrants a change in custody. The mother pointed out that William's job "keeps him away from the minor child for long periods of time" and therefore Katie is "being kept by her step-mother who has shown nothing but scorn and hate for" Brittany.

¶8. Brittany alleged a change in custody was warranted because the "attitude and actions displayed by the Father and step-mother are intentional, confusing[,] and detrimental to the minor child's health, safety and welfare." As an alternative to modification, Brittany requested additional visitation without supervision, claiming "any reason for continued supervised visitation has long disappeared."

¶9. Following Brittany's modification request, the parents signed an agreed temporary order allowing her additional visitation without supervision. The order also required the parties to attend a co-parenting class and enjoined them from drinking or smoking in Katie's presence. With the exception of these alterations, the original custody agreement remained "in full force and effect."

¶10.   Within a year of signing this agreed order, the mother again sought modification. Her renewed motion mirrored the first motion for modification in asserting that William's marriage to Bridget—and the resulting issues from the stepmother's presence—constituted a material change in circumstances detrimental to the child. Specifically, she reiterated her claim that William and Bridget interfere with the child's relationship with Brittany, and that the father and stepmother use the child "as a weapon to punish" her. She further alleged that William and Bridget "have entered into a deliberate plan to alienate the minor child from her mother." Brittany again concluded her motion by requesting "paramount physical care[,] custody[,] and control" of Katie.

¶11.   The mother also renewed her motion for contempt, raising many of the concerns outlined in her first motion—namely that William "refuses to share in the decision-making rights" concerning the child's health and education. In responding to Brittany's request for modification, William counterclaimed for contempt and modification. He asked that some of Brittany's visitation be limited and her child support be increased.

¶12.   The chancellor appointed a guardian ad litem, Kelly M. Rayburn. He also appointed Dr. Jule P. Miller to perform a forensic interview with the child and her family. Over the next year, these specialists gathered information regarding Katie's well-being and relationship with her parents, and produced reports of their findings.

¶13.   Dr. Miller met with Katie and her family on several occasions. First, he interviewed the child and her mother together, then the child and her father. He noted the child has a "reasonable attachment to her mother," and likewise a "good attachment to her father and

4

stepmother." He also observed Katie has a close relationship with both of her brothers and "is influenced by whomever she is around."[3] The specialist conducted two different forensic tests during the various visits with Katie, which revealed she "is suffering from significant anxiety, sadness, and anger that she is trying to keep unconscious through the coping mechanisms of denial and avoidance."

¶14. Dr. Miller sat down with Brittany and William together to discuss the parents' concerns about Katie and their relationship with each other. He also met with all four of the parents at once. In this session, the doctor noted that the stepmother was "filled with rage and seemed unable to get past it," which he thought was "concerning for future coparenting." Dr. Miller opined that the child's "attachment to her mother is interfered with by the conflict" between her mother and stepmother.

¶15. Overall, Dr. Miller concluded the child "comes across very well on the surface" and that she "is pleasant, attractive . . . and is clearly bonded well with both mother and father." However, he opined that "just beneath that surface she is struggling with feelings of sadness, anger, and anxiety." He ended his report with the following opinion: "[A]fter meeting her stepmother, and experiencing first-hand how inflexible she was regarding [Katie's] mother, I believe that the only way [the] family will coparent is if her mother gets primary custody. It is essential that the adults learn to work together with less conflict."

¶16. Guardian ad litem Kelly Rayburn also met with Katie and each of her parents. In addition, he interviewed and collected affidavits from people who knew and interacted with

---

[3] Brittany's husband Steve has a son who is two years older than Katie, and William and Bridget have a child younger than her.

the families. Following his investigation, Rayburn expressed "serious concerns regarding parental alienation, particularly in light of Dr. Miller's observations . . . ." Rayburn relied heavily on Dr. Miller's report in forming his opinion, noting the findings give him "considerable pause" in leaving the custodial arrangement unchanged.

¶17. At the same time, though, Rayburn observed that "the child is healthy and happy in [William's] home and that she is doing well in school." He wrote in his report, "As a layperson, my observations of the child suggest that she has adapted to living with her father and having visitation with her mother."

¶18. Ultimately, while the guardian ad litem believed there was a "material change in circumstances that is detrimental or harmful to the child," he declined to give a recommendation regarding custody, explaining that "the Court is the ultimate determiner of whether a custodial change should take place."

¶19. The Stone County Chancery Court held a two-day hearing on Brittany's motion for contempt and modification. At the outset the parties agreed to enter into evidence the reports from Kelly Rayburn, Dr. Jule Miller, and Dr. Kevin Passer.[4]

¶20. The guardian ad litem took the stand first, explaining his investigation and the findings of his report. Rayburn's testimony largely followed his report. When asked, Rayburn acknowledged an unsubstantiated allegation by the mother that Bridget had slapped Katie, as well as another unsubstantiated claim that a family member had acted in an inappropriate manner toward the child. The guardian ad litem quickly rejected these claims

---

[4] Dr. Passer, who William hired to evaluate Katie, did not testify at the hearing, and his report is not included in the record on appeal.

and confirmed that to his knowledge there had been no abuse or neglect.

¶21.  Another witness, a CPS worker who had investigated the family and visited William's and Bridget's home, testified that Katie "didn't show any signs of neglect" or "any signs of being fearful" of her father or stepmother "at all."

¶22.  As Katie's therapist, Stephen Midgette provided testimony about his interactions with Katie and her family.  Based on his sessions with the child for over the past year, Midgette said he does not believe there has been "any alienating effect" on Katie.  He also observed that the child related just as well to her mother as her father.

¶23.  In her testimony, Brittany reiterated and further explained her complaints about William and his new wife—primarily Bridget's hostility toward her and interference with her relationship with Katie.  She expressed particular concern the stepmother forced the child to call her "Mom" in an attempt to convince the little girl that Brittany was no longer her mother.  However, Katie's therapist testified that she "has always insisted to me that she has never called her stepmother mom, that she always calls her Bridget."

¶24.  Brittany also claimed that on occasion Katie would return from her time at her father's house with the same dirty clothing she had left in the previous week.  Yet when asked by counsel for William, "[y]ou're not telling this court that she's in any way being abused . . . [o]r that she's being neglected?" Brittany clarified, "No, sir."  The attorney continued, "Basically what you, your former husband, and the two stepparents, Steve and Bridget, have is a total breakdown in communication, correct? . . . That's the point.  Y'all can't communicate?"  The mother responded, "Correct."

¶25. To support her contention that William did not allow her to communicate with her daughter, Brittany presented a log of the times she tried to speak with Katie over the phone but the father either refused or did not answer her calls.

¶26. In his testimony, William reflected on the past four years as Katie's primary care-giver. He confirmed Katie refers to her stepmother as "Bridget," not "mom." The father explicitly denied his ex-wife's allegation that he returned their daughter wearing dirty clothes, stating, "That never happened."

¶27. Katie's stepmother, Bridget, detailed some of the ways she has cared for the child since she entered her life at age two. When asked whether transferring custody to Brittany would be in the child's best interest, the stepmother said, "No, sir," and explained Katie is "in a good stable home now" and "is [doing] very good in school."

¶28. After considering all the evidence—including pleadings, testimony, and reports from Dr. Miller and the guardian ad litem—the court ultimately denied Brittany's request for contempt and modification. The chancellor explained that a change in custody was not warranted because the mother "failed to meet the burden required of her of a substantial change in circumstances which adversely affects the minor child . . . ."

¶29. Although the court denied Brittany's request for modification and contempt, it did order William to "notify Brittany, by text, one (1) day prior to any doctor's appointments for the minor child" and to tell Brittany about "all non-school events within twenty four (24) hours of having received notice of such events." Further, the court ordered the father "not to take any action to prevent the Plaintiff, Brittany, from attending any extracurricular

activities or events."

¶30. Brittany filed a motion to reconsider, which was denied. She now appeals, raising two assignments of error.

**STANDARD OF REVIEW**

¶31. Our standard of review in child-custody cases is limited. *Gateley v. Gateley*, 158 So. 3d 296, 300 (¶19) (Miss. 2015). "[W]e must affirm the chancellor's findings of fact if they are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, [or] clearly erroneous[,] or [applied] an erroneous legal standard was applied." *Id*. (internal quotation marks omitted).

**DISCUSSION**

**I.     The mother failed to prove a material change that adversely affected the child.**

¶32. Brittany argues that in considering her motion for custody modification the chancellor "erred in failing to find a material and substantial change in circumstances detrimental to the minor child."

¶33. "Mississippi utilizes a three-prong test to determine whether custody modification is warranted." *Hammons v. Hammons*, 289 So. 3d 1214, 1218 (¶16) (Miss. Ct. App. 2020). "First, there must be a material change in circumstances of the custodial parent." *Id*. "The burden of proving the material change in circumstances falls on the party seeking modification." *Id*. "The circumstances presented for consideration must have arisen after the entry of the first custody order." *Id*. We have emphasized that "[t]he purpose of modification is not to allow a second bite at the apple by relitigating the same facts." *Id*.

9

¶34. To satisfy the second prong of the test, "the moving party must show that the change in circumstances has an adverse effect on the minor child." *Id.* at (¶17). "Any change in custody must be predicated on the conduct of the custodial parent that poses a danger to the mental or emotional health of the child." *Id.* (quoting *Williams v. Willis*, 49 So. 3d 122, 124 (¶7) (Miss. Ct. App. 2010)).

¶35. Finally, "[m]odification must be in the best interest of the minor child." *Id.* at (¶18). This "polestar consideration" of the child's best interest "is based on an application of the *Albright* factors to the facts of the case." *Id.* at 1218-19 (¶18).

¶36. In seeking modification, Brittany primarily cites William's remarriage to Bridget as the material change that has adversely affected their daughter. Specifically, she claims that Bridget is the "main cause of the conflict between the parties" and that her "animosity" toward and "hatred" for Brittany is causing Katie to suffer.

¶37. However, our Supreme Court has steadfastly held that "remarriage itself does not constitute a material change in circumstances that would justify a change of custody." *Dykes v. McMurry*, 938 So. 2d 330, 336 (¶22) (Miss. Ct. App. 2006) (quoting *Robison v. Lanford*, 841 So. 2d 1119, 1123 (¶14) (Miss. 2003)). In *Dykes*, a non-custodial father filed for modification, arguing the mother's remarriage constituted a material change that adversely affected the child. *Id.* at 332 (¶3). The chancellor denied the motion, stating that the child had not suffered any "detrimental" treatment at his mother's home, and that the law "requires more than occasional unhappiness in a child to justify a contested change of custody." *Id.* at 332, 336 (¶¶5, 21). We affirmed the chancellor's decision, as the evidence showed the

child was "healthy and well-adjusted in his mother's home" and that he "suffered no abuse" and "never felt threatened at his mother's house." *Id.* at 336 (¶22).

¶38. Consistent with *Dykes*, our precedent indicates that remarriage may constitute a material change only in extreme situations, such as physical or mental abuse by the stepparent. *See Savell v. Morrison*, 929 So. 2d 414, 419 (¶17) (Miss. Ct. App. 2006) (where stepfather "threatened [the child] with physical punishment, had desires to 'pepper' her with paintballs and bind her to a chair with duct tape," and "admitted willingness to go to jail if he 'snapped'"); *see also Summerlin v. Eldridge*, 145 So. 3d 1261, 1264 (¶¶12-13) (Miss. Ct. App. 2014) (where stepfather "had a temper and verbally attacked everyone living in the house" and behaved in a way that caused the mother to "worr[y] about the safety of her children").

¶39. In this case, evidence indicates the stepmother does not present a physical or mental danger to Katie. Like the child in *Dykes*, Katie appears to be healthy and relatively well-adjusted to her environment. Indeed, the guardian ad litem noted in his report that William believes "the child is healthy and happy in his home and that she is doing well in school." Likewise, Dr. Miller noted the child appears to have a "good attachment to her father and stepmother." Furthermore, none of Bridget's alleged hostility toward Brittany is directed at Katie. In fact, the stepmother's testimony indicates she has a close, positive relationship with the child. And while Brittany points to the anxiety and sadness observed by Dr. Miller, it takes "more than occasional unhappiness in a child" to warrant modification. *Dykes*, 938 So. 2d at 332 (¶21).

11

¶40. Given the evidence supporting the chancellor's decision, as well as our precedent regarding the effect of a custodial parent's remarriage, we will not hold the trial court in error for finding no material change in circumstances adversely affecting the child.

¶41. Brittany also protests that William does not include her in important parental decisions such as medical appointments and school and extracurricular events. She further complains he often forbids her from communicating with Katie by telephone and that Bridget contributes to this problem.

¶42. Yet the trial court explicitly addressed these particular concerns in its order. While denying Brittany's request for contempt, the court ordered William to notify her of Katie's doctor's appointments and extracurricular activities. The court further ordered the father "not to take any action to prevent [the mother] from attending" these events.

¶43. Even if the trial court had not granted Brittany that relief, we have held that "parties' inability to cooperate with one another" is not a sufficient reason to modify custody. *Lipsey v. Lipsey*, 755 So. 2d 564, 566 (¶7) (Miss. Ct. App. 2000). "This Court does not find lack of cooperation to be a pinnacle that warrants a reconsideration of custody . . . ." *Id*. at 567 (¶9). Furthermore, we have specified that a custodial parent's interference with visitation is an issue of contempt rather than modification. *See Mixon v. Sharp*, 853 So. 2d 834, 838 (¶10) (Miss. Ct. App. 2003) ("Changing child custody is not appropriate punishment for contempt."); *see also* Deborah H. Bell, *Bell on Mississippi Family Law* § 12.12.3[h] (3d ed. 2020) ("Minor or isolated instances of lack of cooperation in visitation should be addressed in contempt proceedings rather than through modification").

¶44. The majority of Brittany's arguments for modification pertain to William's remarriage to and Brittany's contentious relationship with Bridget, the stepmother. In light of the above precedent regarding remarriage and parental interference, as well as the testimony and evidence presented, the trial court was within its discretion to decline to find a material change in circumstances.

¶45. Significantly, there is little indication that the issues Brittany raises have adversely affected Katie. Reports from Dr. Miller and the guardian ad litem, as well as testimony from William, Bridget, and Katie's therapist, establish the child is healthy and well-adjusted to life in her father's home. This evidence supports the chancellor's finding there was no material or adverse change to warrant modification.

¶46. Because Brittany did not prove a material change in circumstances that adversely affected her daughter, we need not reach an application of *Albright* here. The chancellor was correct in denying the mother's request for modification based on her failure to meet this burden.

## II. The *Riley* test does not apply.

¶47. In the alternative, Brittany argues the chancellor "committed manifest error in ignoring the adverse environment test used in determining custody."

¶48. In lieu of the traditional test for modification, courts may on rare occasions apply the "adverse environment" test, which our Supreme Court established in *Riley v. Doerner*, 677 So. 2d 740, 745 (Miss. 1996). There, the Court provided a way for trial courts to make a best-interest determination even where there has not been a material change in circumstances

13

that adversely affects the child. *Id*. at 744. The *Riley* Court held that "when the environment provided by the custodial parent is found to be adverse to the child's best interest, *and* that the circumstances of the non-custodial parent have changed such that he or she is able to provide an environment more suitable than that of the custodial parent, the chancellor may modify custody accordingly." *Id*. (emphasis in original).

¶49. This alternate test "applies only when a child is living in *genuinely adverse* circumstances." Deborah H. Bell, *Bell on Mississippi Family Law* §12.12[4] (3d ed. 2020) (emphasis added). Indeed, we have stated that this "standard should only be applied when the child's health and welfare are truly at risk[.]" *Savell v. Morrison*, 929 So. 2d 414, 419 (¶14) (Miss. Ct. App. 2006).

¶50. For example, in *Riley* the Court affirmed the chancellor's transfer of custody to the father where the mother's home was "the site of illegal drug use" and "a succession of live-in boyfriends," and where the chancellor had determined there was "absolutely no question that . . . it would be in the best interest of this child to live with her father." *Riley*, 677 So. 2d at 743-44; *see also Carter v. Carter*, 735 So. 2d 1109, 1113 (¶11) (Miss. Ct. App. 1999) (affirming a chancellor's transfer of custody to the father based on an application of the *Riley* test where the evidence showed the children were sent to school "in an unclean and unkempt condition," had "noticeable body odors," and were not "appropriately dressed . . . to protect them from inclement weather" and where the mother admitted to a "lack of sufficient resources [that] caused her to have to wash clothing in the bathtub"); *see also Hoggatt v. Hoggatt*, 796 So. 2d 273, 274 (¶3) (Miss. Ct. App. 2001) (finding the *Riley* test was

applicable where the mother exhibited a "lack of supervision that caused the child to repeatedly place himself in situations where he could easily have been subjected to substantial physical harm, and a blatant lack of concern over the child's medical well-being as evidenced by the mother's failure to act on the child's severe dental problems").

¶51. As the trial court correctly concluded, the situation before us does not "rise[] to the level that would warrant a change in custody as contemplated by *Riley* or its progeny." We therefore affirm the chancellor's denial of the request for modification on this ground.

## CONCLUSION

¶52. Brittany filed for modification seven months after agreeing to a custody order upon divorce. Within a year of signing another agreed order, she again filed for modification. After much consideration, the chancellor determined modification of custody was not warranted. The decision to deny Brittany's motion for modification was well within the chancellor's discretion; therefore, the judgment of the Stone County Chancery Court is **AFFIRMED**.

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

15